# STARFISH CONDOMINIUM ASSOCIATION
ET AL. *v.* YORKRIDGE SERVICE
CORPORATION, INC. ET AL.

[No. 51, September Term, 1982.]

*Decided April 8, 1983.*

694

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Sidney Kaplan,* with whom were *Paul Bloomberg* and *Kaplan & Kaplan* on the brief, for appellants.

*Glenn E. Bushel,* with whom were *Gerard P. Martin* and *Melnicove, Kaufman, Weiner & Smouse, P.A.* on the brief, for appellees.

RODOWSKY, J., delivered the opinion of the Court.

This case involves claims that an Ocean City condominium has been defectively constructed. The claims are based upon the implied warranties created by Md. Code (1974, 1981 Repl. Vol.), § 10-201, §§ 10-203 through 10-205 of the Real Property Article (RP). There are multiple issues, including applicability of the statutory warranties, standing of the council of unit owners to sue, a discovery dispute, sufficiency of the evidence and liability of a parent corporation for the obligations of its subsidiary.

In the early 1970's Paddy Construction Company, Inc. (Paddy) was acting as both developer and builder of three garden apartment buildings on the eastern half of the block of Ocean City land bounded on the south by 126th Street, on the east by Assawoman Drive, on the north by 127th Street and on the west by Ocean Highway. Each building contained

three floors, of four apartment units each, for a total of 12 units per building and of 36 units in the project. When the construction was 70% to 85% completed, Paddy's business failed and the deed of trust on the property was foreclosed. At the trustees' public auction on November 30, 1973, the property was bought in, at a price of $755,000, on behalf of Yorkridge-Graham Joint Venture No. II (Joint Venture).

The Joint Venture was a Maryland general partnership in which a 60% interest was held by Yorkridge Service Corporation, Inc. (Service Co.) and a 40% interest was held by R. Walter Graham, III (Graham). Service Co. is a Maryland stock corporation and is a wholly-owned subsidiary of The Yorkridge Federal Savings & Loan Association of Baltimore County (the S&L). The S&L's offices are at 3725 Old Court Road, Pikesville, Maryland. Graham was an Ocean City realtor. A written joint venture agreement, effective November 30, 1973, was executed between Service Co. and Graham on February 28, 1974. It contemplated the prompt completion of construction on the property. Graham was to supervise construction. Service Co. was to control the disbursement of all funds of the venture. A commitment for a loan to the Joint Venture had been procured by Service Co. from Independence Federal Savings & Loan Association of Philadelphia in the principal amount of $725,000. Service Co. was also to provide additional development money by way of loans to the Joint Venture. A condominium regime was to be imposed upon the property, and Graham was to use his best efforts to effect sales of the individual condominium units.

The deed from the foreclosing trustees to the Joint Venture was granted on February 27, 1974. Thereafter the Joint Venture expended $222,315, including punch list items, in completing construction. The certificate of occupancy was issued on March 10, 1975. On April 29, 1975 the declaration, bylaws, and plats were recorded establishing Starfish III, IV, & V Condominium (Starfish). Melvin Berger (Berger), the president of S&L and of Service Co., John J. Davis (Davis), the vice president of S&L and of Service Co.,

and Graham were the initial members of the board of directors of the council of unit owners. The first annual meeting of the council of unit owners of Starfish was held on December 18, 1975. By that time sales of 35 out of the 36 units had been closed.

On May 11, 1976 Starfish Condominium Association, which is the council of unit owners at Starfish (Council), and the owners of nine units brought suit against the Joint Venture, Service Co., Graham, S&L, Berger and Davis. On July 2, 1976 the owners of nine additional units brought a separate action against the same defendants. These actions were consolidated and tried by the court. While the actions asserted a number of theories, we are concerned here only with the claims predicated on statutorily implied warranties. The Council sought damages for alleged construction defects relating to the common elements. The owners of individual units sought damages for construction defects in their particular units. One unit owners' claim was dismissed by the trial court, and that dismissal is not involved in these appeals.

In a memorandum opinion and order of April 21, 1980, the trial court adjudicated most of the claims. Judgment was entered in favor of Berger and Davis as to all claims. There is no appeal from that determination. Judgment was entered in favor of the remaining defendants on the claim of the Council. The Council appeals that adverse judgment. Separate judgments for damages were entered against the Joint Venture, Service Co. and S&L in favor of the 17 remaining unit owners. These judgments were in amounts ranging from $2,227 to $2,567. The three judgment debtors appeal those judgments.

We shall refer to the Joint Venture, Service Co. and S&L collectively as "Defendants," and to the Council and unit owner parties collectively as "Plaintiffs."

In its April 21, 1980 order the trial court made no disposition of the claims against Graham, because Graham had filed in bankruptcy. We dismissed prior appeals noted from the April 21, 1980 order, because it was not a final judgment.

*Starfish Condominium v. Yorkridge Service,* 292 Md. 557, 440 A.2d 373 (1982). Thereafter, the Plaintiffs dismissed their claims against Graham. A final judgment, which did not disturb the previous trial court determinations, was entered on May 6, 1982. We granted certiorari on cross-appeals from that judgment prior to consideration of the matter by the Court of Special Appeals.

The issues fall into three general categories: (1) those relating to the warranties, (2) those relating to matters of evidence, and (3) whether the corporate veil of Service Co. may be pierced to reach S&L.

I

Defendants assert that no Plaintiff is an "original" purchaser so as to have the benefit of statutorily implied warranties. The argument involves the interpretation of RP §§ 10-201, 10-203 and 10-205 which in relevant part provide:

§ 10-201. Definitions.

(a) *In general.* — In this subtitle the following words have the meanings indicated unless otherwise apparent from context.

(b) *Improvements.* — "Improvements" includes every newly constructed private dwelling unit, and fixture and structure which is made a part of a newly constructed private dwelling unit at the time of construction by any building contractor or subcontractor.

(c) *Purchaser.* — "Purchaser" means the original purchaser of improved realty, and the heirs and personal representatives of the original purchaser.

. . . .

(e) *Vendor.* — "Vendor" means any person engaged in the business of erecting or otherwise creating an improvement on realty, or to whom a completed improvement has been granted for resale in the course of his business.

§ 10-203. Implied warranties.

(a) *Warranties which are implied.* — Except as provided in subsection (b) or unless excluded or modified pursuant to subsection (d), in every sale, warranties are implied that, at the time of the delivery of the deed to a completed improvement or at the time of completion of an improvement not completed when the deed is delivered, the improvement is:

(1) Free from faulty materials;

(2) Constructed according to sound engineering standards;

(3) Constructed in a workmanlike manner; and

(4) Fit for habitation.

(b) *Exception.* — The warranties of subsection (a) do not apply to any condition that an inspection of the premises would reveal to a reasonably diligent purchaser at the time the contract is signed.

. . . .

(d) *Exclusion or modification of implied warranty.* — Neither words in the contract of sale, nor the deed, nor merger of the contract of sale into the deed is effective to exclude or modify any implied warranty. However, if the contract of sale pertains to an improvement then completed, an implied warrant [sic] may be excluded or modified wholly or partially by a written instrument, signed by the purchaser, setting forth in detail the warranty to be excluded or modified, the consent of the purchaser to exclusion or modification, and the terms of the new agreement with respect to it.

§ 10-205. Grant to intermediate purchaser to evade liability.

If a vendor grants an improvement to an intermediate purchaser to evade any liability to a user and purchaser imposed by this subtitle, the vendor is liable on the subsequent sale of the

improvement by the intermediate purchaser as if the' subsequent sale had been effectuated by the vendor without regard to the intervening grant.

As Defendants see it, the Joint Venture was the original purchaser of the property. They say that the sale to the Joint Venture from the trustees was not for the purpose of evading liability, as addressed in § 10-205. Because § 10-205, it is argued, establishes the exclusive basis for ignoring a sale in order to determine the original purchaser, the Joint Venture became the original purchaser so that the later sales by it were free of warranty. This argument conflicts with other provisions of the statute. Under § 10-203 (a) the implied warranty relates to the condition of the improvement "at the time of the delivery of the deed to a completed improvement or at the time of completion of an improvement not completed when the deed is delivered . . . ." The subject matter of the warranty is a completed improvement. Furthermore, "sale" as used in § 10-203 means a sale from a vendor to a purchaser. A "purchaser" is "the original purchaser of improved realty . . . ." § 10-201 (c). Improvements, which make realty "improved," include "every newly constructed private dwelling unit, and fixture and structure which is made a part of a newly constructed private dwelling unit at the time of construction . . . ." § 10-201 (b). At the time of the trustees-Joint Venture sale, the improvements were 15% or more short of completion. The condominium units in their condition at the time of the trustees' sale could not constitute completed "dwelling" units, because no certificate of occupancy could be issued. Moreover, the trustees did not undertake to complete the work which was not completed when their deed was delivered to the Joint Venture. It was the Joint Venture which completed the newly constructed private dwelling units on the property, which acted as vendor, and on which the implied warranty obligations are imposed in this case.

Defendants next point to a provision in the form of contract of sale used by the Joint Venture in sales to unit owners. It reads: "The Unit and the appliances and fixtures

contained therein are sold 'as is' and except as may be provided for on exhibit 'B' attached hereto, the Seller is under no obligation to decorate, repaint, replace or repair any item or matter contained therein." There was no standard exhibit "B." The reference is a drafting technique designed to permit special features for a particular transaction to be incorporated within the form contract.

This "as is" provision does not satisfy the requirements of § 10-203 (d). It does not "[set] forth in detail the warranty to be excluded or modified . . . ." The obvious purpose of this requirement is to advise the purchaser of the rights which the statute confers and which the purchaser is asked contractually to waive. Because the form of contract used at Starfish fails so to advise, the attempted exclusion of implied warranties by the "as is" provision is ineffective.

Accordingly, we hold that each of the original purchasers of the condominium units from the Joint Venture obtained from the Joint Venture the implied warranties described in § 10-203 (a) on that particular unit. We also hold that the Joint Venture, by statute, made implied warranties as to the common elements, but that analysis is more complex.

Starfish consists of three separate buildings. The condominium declaration, Article FOURTH, ¶ 2, provides in part as follows:

> As to each separate Building . . . beginning at the ground level, of each Building and extending from there upwards, all of the area of each Building not included in the individual Units, as shown on the Plats, including but not limited to stariways [sic], breezeways, partitions, doors, windows, plumbing, heating, electric, air-conditioning components, doorways, curbing, parking areas [and] pedestrian walkways, shall be general common elements as between the owners of the Units within that specific Building, and shall be limited common elements as between the owners of the Units with[in] that specific Building and the owners of Units in the other Buildings, the rights and limitations of each

Unit owner as to such general and limited common elements to be determined by the Board of Directors in accordance with provisions of the By-Laws.

In its complaint directed to defects in the common areas, the Council specified alleged defects building by building. As to one or more of the buildings, the Council alleged defects in electrical wiring, electric service entrance meter installation, roof, gutters and downspouts, air-conditioning compressors, stairways and walls.

Each of these alleged defects relates to a "fixture and structure which is made a part of a newly constructed private dwelling unit," so that it constitutes an improvement under § 10-201 (b). Each is the subject of the warranty provided by § 10-203 (a).

Under the statute, however, the warranties run to the original purchasing unit owners. The Maryland Condominium Act, Title 11 of the Real Property Article, in § 11-107 (a), provides that each unit owner owns "an undivided percentage interest in the common elements equal to that set forth in the declaration." Under the Starfish declaration, that percentage is 2.777 per unit. In a condominium regime unit owners own the common elements in fee as tenants in common. *See Andrews v. City of Greenbelt,* 293 Md. 69, 73-74, 441 A.2d 1064, 1068 (1982). This matter of legal title gives rise to another argument advanced by the Defendants.

In the instant matter, the claim for damages for breach of warranty relating to the common elements at Starfish was asserted by the Council in its own name and not in the name of any unit owner or owners. Because the Council does not own the common elements, Defendants assert that the Council lacks standing. In this connection Defendants distinguish between capacity to sue and standing to sue. They recognize that under RP § 11-109 (d) a council of unit owners, even if unincorporated as is the Starfish council, has the capacity to sue or be sued. But, say the Defendants, that capacity to sue may not be exercised, for want of standing, by suing on a warranty which did not run to the Council and which relates

to improvements, *i.e.,* the common elements, which the Council does not own.

In its memorandum opinion of April 21, 1980, the trial court concluded that the Council had standing because "effect should be given to the recent amendments to the Horizontal Property Act . . . giving [a council of unit owners] the right to sue to the use of the unit owners in relation to the common elements." That reference was to House Bill 1946 of the 1980 Session of the General Assembly, signed by the Governor on May 20, 1980 and effective July 1, 1980 as Ch. 681. It is RP § 11-109 (d) (4) which provides that a council of unit owners has the power, *inter alia:*

> (4) To sue and be sued, complain and defend, or intervene in litigation or administrative proceedings in its own name on behalf of itself or two or more unit owners on matters affecting the condominium.

Although the above-quoted statute was not in effect at the time the trial court made its ruling, the April 21, 1980 order was not a final judgment. Until the orders for appeal were entered following the final judgment of May 6, 1982, the ruling by the trial court was subject to revision. For this reason, we find it unnecessary to determine whether the Council had standing to sue on the instant claim prior to the 1980 amendment. Assuming *arguendo* that the Council did not have standing when the litigation was instituted, the defect was procedural only and was cured by the 1980 amendment.

*Friendly Village Community Association, Inc. v. Silva & Hill Construction Co.,* 31 Cal. App. 3d 220, 107 Cal. Rptr. 123 (1973), on which Defendants place heavy reliance, held that an incorporated association of condominium unit owners had no standing to sue for damage to common elements caused by negligence, because the association did not own the property. That court viewed its conclusion as consistent with the rule that every action must be prosecuted in the name of the real party in interest and said that the real parties in interest were the unit owners. Md. Rule

203 a requires an action to be prosecuted in the name of the real party in interest, with certain exceptions set forth in section b. These exceptions are various types of representative actions. In essence, the 1980 amendment to the condominium statutes declares that, under the circumstances there specified, a council of unit owners may sue in its own name in a representative capacity. The amendment affects procedure. The question then arises whether that change can be applied to the present case.

*Janda v. General Motors,* 237 Md. 161, 205 A.2d 228 (1964) reviewed the various rules formulated by courts to aid in determining whether a statute is to be applied retrospectively or prospectively. There we said, quoting from *Richardson v. Richardson,* 217 Md. 316, 320, 142 A.2d 550, 553 (1958), that " '[o]rdinarily a change affecting procedure only, and not substantive rights, made by statute (and an amendment of the Maryland Rules has essentially the same effect) applies to all actions [and matters] whether accrued, pending or future, unless a contrary intention is expressed.' " 237 Md. at 168, 205 A.2d at 232. *See also Ireland v. Shipley,* 165 Md. 90, 98, 166 A. 593, 596 (1933). Chapter 681 of the Acts of 1980 does not express an intent contrary to the general rule. That Act's effective date clause reads that it "shall take effect July 1, 1980." The title to that Act provides that the Act is, in part, for the purpose of "clarifying and enlarging certain powers of a council of unit owners . . . ." Even on the assumption that the representational suit provision constituted an enlargement, rather than a clarification, of the powers of a council of unit owners, the 1980 enactment in no way indicates that it is inapplicable to pending litigation.[1]

---

1. The Maryland Condominium Act was further revised by Ch. 246 of the Acts of 1981 which also took effect prior to final judgment in the instant matter. The 1981 amendment carried forward the representational suit provision. *See* Md. Code (1974, 1981 Repl. Vol.), RP § 11-109 (d) (4).

The 1981 legislation also added RP § 11-131, dealing with warranties, which in subsection (c) (1) provides that "there shall be an implied warranty on common elements from a developer to the council of unit owners." That newly created warranty applies "only to those condominiums for which a notice of intention to create a condominium is issued on or after July 1, 1981," the general effective date of the 1981 amendments. See RP § 11-142

The present case is indistinguishable in principle from *Richardson, supra,* where a husband, suing for divorce, obtained service on his wife who failed timely to answer. A decree *pro confesso* was entered on June 19, 1957. The wife moved to strike the decree *pro confesso* on July 25, 1957. At that time Md. Rule 675 a 3 read as follows:

> At any time after <u>the passage of an interlocutory decree, and within thirty days from the date on which</u> a decree *pro confesso* shall have been entered, and before final decree, upon motion or upon its own initiative, the court may set aside the decree, and permit the filing of an answer or the interposing of other defense. [Underlining supplied.]

On September 26, 1957 the rule was amended to delete the underlined language, so that the time within which a motion to set aside such a decree was to be filed was no longer limited to 30 days following the decree. At a hearing on October 2, 1957 the trial court denied the wife's motion to strike and a final decree was entered. This Court reversed and remanded the matter for further proceedings. Despite the fact that the wife's motion was out of time under Rule 675 as it stood when her motion was filed, the procedural change in the law was applied. We said that

> in the present case the [husband] had no vested right to the maintenance of any procedural rule affecting his case until the termination thereof. . . . This case is not one in which the successful party in the trial court has a final and enrolled judgment and his adversary's right of appeal has expired by lapse of time. [217 Md. at 321-22, 142 A.2d at 553.]

In the instant matter, applying the 1980 amendment to the Maryland Condominium Act does not deprive the Defen-

---

(f). However, the warranty under RP § 11-131 (c) (1) is "[i]n addition to the implied warranties set forth in § 10-203 of" the Real Property Article, which is the section creating the substantive right on which the Council in this case seeks to sue as a representative.

dants of any vested right. This is so, even though the Council sues for the entire cost of making the common elements at Starfish conform to the implied warranties under RP § 10-203. Because the § 10-203 implied warranties run only to original purchasers of condominium units, it might be argued that each original purchaser at Starfish would be entitled to claim for only 1/36th of any damages. However, the few cases which have considered this question are to the contrary. *Stony Ridge Hill Condominium Owners Ass'n v. Auerbach,* 64 Ohio App. 2d 40, 410 N.E.2d 782 (1979) involved a 24 unit condominium. Representations had been made by the developer to only four of the unit owners that the roof of the building was a " 'twenty-year roof.' " Suit was brought by the council of unit owners which had statutorily conferred standing. The court concluded that "[e]ach person who purchased a condominium unit, as a result of the misrepresentation, has a right to have the whole damage to the entire common area of the building remedied and completely satisfied." *Id.* at 43, 410 N.E.2d at 785. Otherwise, "[p]ayment by defendants of only one-sixth of the roof damage, representing the share of four unit owners, and the consequent repair of only one-sixth of the roof would still leave the roof in the same leaky condition, and would be the equivalent of giving plaintiff no legal remedy or relief whatever." *Id.* at 44, 410 N.E.2d at 786. Of similar effect is *Drexel Properties, Inc. v. Bay Colony Club Condominium, Inc.,* 406 So. 2d 515 (Fla. App. 1981). That case was a class action brought by the unit owners association and by representative unit owners based, *inter alia,* upon breach of a judicially created implied warranty on new dwellings which ran only to original purchasers. The court held

> that as to common elements, the [plaintiffs] may recover the entire damages on either [an implied warranty or negligence] theory, albeit the subsequent or remote purchasers will benefit thereby. To conclude otherwise and apportion the damages would penalize the original purchasers. In order for appellees to receive the benefit of their bargain and be made whole, the amount of damages awarded

must equal the sum necessary to correct the condition. [*Id.* at 519-20.]

In the case at hand, one or more of the original purchasing unit owners in Starfish could directly have sued for breach of § 10-203 implied warranties as to the common elements and could have sought the entire damages to the common elements.[2] Under Md. Rule 209, the action could have been treated as a class action, particularly to protect the parties defendant from possible multiple or successive suits. The 1980 amendment, codified as RP § 11-109 (d) (4), created a new procedure by declaring a council of unit owners to be a proper representative of two or more unit owners on matters affecting the condominium. No change of substance, by way of enlargement of any liability of the Defendants, was effected.

In furnishing the validity for the Council's standing, the 1980 amendment operates, under the facts in this case, pursuant to the rule that a court applies the law in effect at the time of its decision. *See United States v. Fresno Unified School District,* 592 F.2d 1088 (9th Cir. 1979), *cert. denied,* 444 U.S. 832, 100 S. Ct. 62, 62 L. Ed. 2d 41 (1978 presidential reorganizational plan transferring to the Attorney General the function of initiating "pattern and practice" suits under Title VII of the Civil Rights Act of 1964 applied to pending suit initiated in 1975 by the Attorney General); *United States v. County of Hawaii,* 473 F. Supp. 261 (D. Hawaii 1979) (same); *T & R Joint Venture v. Office of Planning and Zoning,* 47 Md. App. 395, 424 A.2d 384 (1980) (county council bill effective December 21, 1979, conferring standing, as an aggrieved party, on the office of planning and zoning under statute governing appeals from any decision of the zoning hearing officer, applied to an October 5, 1979 appeal to the circuit court from the board of appeals' dismissal for

---

2. The warranty on common elements provided by RP § 11-131 (c), which runs directly to the council of unit owners, is now enforceable only by the council as to general common elements, and, as to a limited common element, either by the council or by any unit owner to whose use it is reserved. Md. Code (1974, 1981 Repl. Vol., 1982 Cum. Supp.), RP § 11-131 (c) (4).

lack of standing on an appeal from the zoning hearing officer noted on May 14, 1979).[3]

We now turn to the merits of the Council's appeal. The issue involves the interpretation of the trial court's opinion. The Council's position is that the trial court conceptually divided the warranty along the lines that the work of constructing Starfish was physically divided. Physical construction was in two phases, one by Paddy and the other by the Joint Venture. The Council says that the trial court erred by concluding that the Joint Venture did not warrant work performed during the Paddy phase. That work included construction of the common elements. The Defendants see the trial court as having concluded simply that the Council failed to meet its burden of proof as a factual matter, so that judgment against the Council should be affirmed. Set forth below are the relevant portions of the trial court's opinion:

> The Council hired expert witnesses who proved that in certain respects the three buildings were not constructed by Paddy Construction Co., Inc. according to sound engineering standards, in a workmanlike manner, fit for habitation, and free from faulty materials. The Council also proved through [its] president, John R. Morely, similar defects in the three buildings. The Council also proved the approximate cost of correcting defects.
>
> . . . .
>
> Paddy Construction Co., Inc. excavated the land, drove the piles, constructed the walls and roofs and installed the windows in all three buildings, thereby engaging in the business of erecting those improve-

---

3. The Starfish declaration, quoted above, establishes as limited common elements those portions of each building in which the defective conditions are said to exist. There are, however, at least two original purchaser unit owner plaintiffs in each of the three buildings. Thus we need not here decide whether the minimum of two unit owners, for whose benefit the Council has standing to sue under § 11-109 (d) (4), may be calculated by including unit owners who do not enjoy exclusive use of the limited common elements in a particular building.

ments on realty. The original purchaser of the improved realty was Yorkridge-Graham Joint Venture No. II . . . .

The Council also proved defects in work done by the Defendant, Yorkridge-Graham Joint Venture No. II, in completing the construction of the three buildings.

. . . .

A review of the evidence leads to the conclusion that the claims of the Council for defects in the common elements relating to roofs, walls, the rough plumbing, the rough wiring, the vents and drain pipes, and the insulation are not recoverable by the Council from the Defendant, Yorkridge-Graham Joint Venture No. II. The burden is on the Council to prove each and every item of damage claimed as attributable to the Defendant, Yorkridge-Graham Joint Venture No. II, by a preponderance of the evidence. This burden has not been met.

We have previously explained that the unit owner Plaintiffs were original purchasers and that the Joint Venture was the vendor which made the § 10-203 warranties. That warranty obligation is not dependent on the vendor actually having done the warranted work. For example, in *Lock Hill Constr. Co. v. Fricke,* 284 Md. 708, 399 A.2d 883 (1979), § 10-203 warranty liability was imposed on the vendor with respect to a well which had run dry and which had been drilled by a subcontractor. A purchaser may recover for breach of § 10-203 warranties without proving negligence on the part of the vendor, and need only show the existence of the warranty, its breach, and resulting damage. In this respect § 10-203 is analogous to the implied warranty of merchantability in sales under the Uniform Commercial Code, discussed in *Sheeskin v. Giant Food, Inc.,* 20 Md. App. 611, 629-30, 318 A.2d 874, 885 (1974).

The Council produced at trial evidence tending to prove that the warranties on the common elements were breached

and tending to prove the cost of conforming the common elements to the warranted condition. Accordingly, judgment rendered against the Council will be reversed and the matter remanded for further proceedings. For reasons to be stated in Part III, these further proceedings will be against only the Joint Venture and Service Co.

## II

The next group of issues raised by the Defendants have as their common denominator the testimony of Edwin Harbin, a witness for the Plaintiffs. They concern air-conditioning. Condominium units at Starfish run from the front to the back of each building with four units on each floor. Two units on each floor are "outside" and two are "inside." An outside apartment has a third exposure with windows in an exterior wall on one side or the other of the building. Interior apartments have no side exposure. All apartments, as built, had 1-1/2 ton air-conditioning units.

In pretrial discovery the Defendants propounded to the Plaintiffs written interrogatories, one of which requested the identity "of each expert witness that you propose to call at trial" and requested production of any written report prepared by each such expert. In their answers the Plaintiffs identified as an expert, among others, Albert F. McGarvey (McGarvey), the president of York Mechanical, Inc., a mechanical contractor. Two written reports by McGarvey, in the form of letters dated November 8 and 16, 1977 from him to Henry H. Lewis, Contractors, were furnished with the answers. As to air-conditioning, these letters in part stated that "[i]n general, the complete installation in regards to workmanship, layout, [and] design is acceptable for the inside units." It was also suggested that condensing units for the outside apartments be replaced with the next larger sizes at an estimated cost of $600 per unit.

At trial on Friday, August 10, 1979 the Plaintiffs called McGarvey. His direct examination, and defense objections, developed that McGarvey had not inspected the

air-conditioning units on his visit to Starfish but that this had been done by his co-worker, Harbin, who had also calculated the heat and cold gains and losses to determine the required air-conditioning capacity. On August 10 Harbin was on vacation but would be available to testify on Monday, August 13. Plaintiffs produced Harbin as a witness on the 13th, but when his direct examination entered the area of opinion evidence, the Defendants objected and sought to have his evidence excluded as a sanction for failure to have identified Harbin as an expert in the answers to interrogatories. Harbin's testimony, on direct and cross, was taken subject to exception. After further argument, the court overruled the objection.

It is apparent that Plaintiffs' counsel did not know that McGarvey was not competent to testify to all matters in his written report until McGarvey was on the stand. Defense counsel told the court, "I don't doubt that [Plaintiffs' counsel] didn't expect the man [Harbin] to testify orginally." Strictly speaking, there was no failure fully to answer the interrogatory as propounded, and Defendants learned that Plaintiffs proposed to call Harbin as an expert simultaneously with the formation of that intent by Plaintiffs' counsel. Furthermore, in making its ruling, the trial court stated that the Defendants would be given the opportunity, if they had not already done so, to obtain an expert in air-conditioning, who would be identified to the Plaintiffs when hired. Plaintiffs' counsel agreed to that arrangement.

Plaintiffs' failure earlier to have identified Harbin as an expert was not willful or contumacious. A trial judge is vested with a large measure of discretion in applying sanctions for failure to adhere to the discovery rules. We see no abuse of discretion. *See Klein v. Weiss,* 284 Md. 36, 56, 395 A.2d 126, 137-38 (1978).[4]

---

4. Defense counsel is particularly exercised by what he considered to be a "signal" from the trial judge that Harbin's testimony would not be credited, because, at the conclusion of the case, the trial court relied on Harbin's testimony for liability and damages. In the course of colloquy the trial judge said: "There is still the testimony, if I should disregard [Harbin's] opinion in favor of his boss' opinion which would be likely to carry more weight anyway, then the defendant would still have Mr.

Harbin's opinion was that the air-conditioning units in the outside apartments should be replaced with 2-1/2 ton units and those in the inside apartments should be replaced by 2 ton units. This generated a conflict with the written report in which Harbin had participated. Defendants' arguments to this Court relating to that conflict go to the weight of the evidence which was for the trier of fact.

Defendants next point out a $10.00 mathematical error in the computation of air-conditioning damages in favor of each of those Plaintiffs who own outside apartments. We agree.[5]

III

S&L appeals from the judgment entered against it in favor of the unit owner Plaintiffs. S&L was not a vendor. It made no implied warranties. These were made by the Joint Venture, a general partnership. Service Co., as one of the partners, is liable on the warranty obligation. S&L is the sole stockholder of Service Co. Plaintiffs contend that the judgment against S&L is proper, because this is a case in which the separate corporate identity of Service Co. may be disregarded, and the liability of the subsidiary corporation placed on the parent corporation.

The trial court's findings on this issue were:

The Court concludes that the Plaintiffs proved by a preponderance of the evidence [S&L's] involve-ment in the original purchase of the three buildings and the completion of construction of the three buildings, in the arrangement of financing therefor, in the fixing of the selling prices of units, in the

McGarvey's expert opinion." This does not convert the ruling into an abuse of discretion. Once Harbin's testimony was received into evidence, defense counsel had to decide whether to rely on the perceived "signal" or to produce additional countervailing and persuasive evidence.

5. The judgments to be modified are those in favor of Paul G. Morgan and Selma Morgan (Apt. 104-IV); Sandra L. Poms and Claudia M. Smith (Apt. 301-IV); Godfrey F. Funk, Jeanne Funk, William M. Porter and Carol Ann Porter (Apt. 304-IV); Frank J. Needle (Apt. 101-V); Julie M. Lewinski (Apt. 201-V) and William H. Pindell, Jr. (Apt. 204-V).

creation of the condominium declaration, and in the establishment of the interest rates on the purchase money mortgages signed by the unit purchasers. Therefore, [S&L] is liable to the same extent that the Joint Venture has been found to be liable, for breaches of express and implied warranties as determined in the case of each Plaintiff, supra.

Judge Levine, writing for this Court in *Bart Arconti & Sons v. Ames-Ennis,* 275 Md. 295, 310, 340 A.2d 225, 234 (1975), stated the rule of law which governs our review:

Although a number of variations upon the same theme may be found, the most frequently enunciated rule in Maryland is that although the courts will, in a proper case, disregard the corporate entity and deal with substance rather than form, as though a corporation did not exist, shareholders generally are not held individually liable for debts or obligations of a corporation except where it is necessary to prevent fraud or enforce a paramount equity. (Citations omitted.)

And *see Damazo v. Wahby,* 259 Md. 627, 633-34, 270 A.2d 814, 817 (1970); *Carozza v. Federal Finance Co.,* 149 Md. 223, 238, 131 A. 332, 338 (1925) and cases cited therein. In *Damazo* we pointed out that the " 'burden of proof is on the one charging fraud to establish by clear, specific acts, facts that in law constitute fraud.' " 259 Md. at 634, 270 A.2d at 817 (quoting *Ace Development Co. v. Harrison,* 196 Md. 357, 367, 76 A.2d 566, 570 (1950)).

The fundamental difficulty with the trial court's analysis of the liability of S&L is that there is no finding of fraud nor is there identification of an equity which requires enforcement, and which is paramount to the ordinary expectation of limited liability on the part of the shareholder of Service Co. Our attention on this piercing issue is focused on the use by S&L of Service Co. as a participant in the speculative venture of completing construction at Starfish

and selling the units.[6] But the record does not contain sufficient facts from which S&L's use of its subsidiary in the transaction can be analyzed as working a fraud or an inequity. For example, the record contains no balance sheets or income and expense statements of Service Co. There are only the most general statements as to the totality of Service Co.'s business. Those facts which do appear, and which we shall summarize below, fall far short of presenting a case for piercing the corporate veil under our decisions.

S&L is a federally chartered, mutual, thrift association. Under 12 U.S.C. § 1464 (c) (1970) such an association was permitted to invest not in excess of 1% of its assets in the capital stock, obligations or other securities of a corporation of the type therein described (a service corporation). Effective July 2, 1970 amendments to regulations of the Federal Home Loan Bank Board permitted a wholly-owned service corporation to invest, *inter alia*, in real estate development and construction of improvements for sale. 35 Fed. Reg. 10,751 (1970) (codified at 12 C.F.R. § 545.9-1 (a) (4)). S&L formed Service Co. in 1971 or 1972. Berger testified it was formed so that "we" could go into certain real estate "deals" and generate mortgages and other business. Service Co. has no separate office and no separate employees. It operates out of the Pikesville premises of S&L with persons on the payroll of S&L. However, an annual fee is paid by Service Co. to S&L for use of the office space and of S&L employees. The three directors of Service Co. are also directors of S&L. Meetings of the directors of each corporation are held and separate minutes maintained for each corporation. Many real estate ventures are offered to Service Co. which analyzes them and picks out the ones it thinks are best.

Graham had contacted Berger and Davis for the purpose of obtaining financing for Graham's proposed acquisition of some of Paddy's properties in Ocean City which were being sold at foreclosure. Two joint venture agreements between Graham and Service Co. evolved. The first agreement

---

**6.** Defendants have not briefed the question as to whether it would have been an illegal investment under federal statutes and regulations for S&L directly to have participated in the venture with Graham.

related to Starfish I and II at 51st and 56th Streets. The second related to the property involved in these proceedings. Cash contributions to the capital accounts of the partners in the Joint Venture totaled $1,000.

Berger, Davis and Graham attended the foreclosure sale of the subject property. It may be inferred that Berger advanced the $37,750 down payment on the $755,000 purchase of November 30, 1973. He was reimbursed by a November 30, 1973 check of S&L made payable to Service Co. and marked "Investment in Service Corporation" which was endorsed by Service Co. for deposit to Berger's account. Service Co. and Graham, as borrowers, obtained a mortgage loan on the subject property, apparently negotiated by Davis, from Independence Federal S&L of Philadelphia in the amount of $725,000, for one year, at 10% interest and calling for a partial release fee of $30,000 per condominium unit. Total costs of the project were $999,315. The evidence is that funds for the project, over and above the loan from Independence, were derived from Service Co.'s cash and by borrowings from Service Co.'s "usual sources," described as banks and other lenders. The loan from Independence was repaid in full by June 30, 1975.

The final tax return of the Joint Venture, filed in 1976, was produced in court by Davis at the request of Plaintiffs' counsel, but it was not put in evidence. Based on the average selling price of $34,211.11 reflected by 18 contracts of sale for condominium units introduced in evidence, it would seem that total sales by the Joint Venture were over $1,230,000.

S&L had initially committed to the Joint Venture to make long term permanent mortgages aggregating $1,368,000 to purchasers of condominium units at Starfish. As matters actually developed, Service Co. made the mortgages which were then assigned to S&L at a 3% discount.

From the standpoint of the substantive legal documents, the paper trail is clear. The Joint Venture agreement is evidenced by a written contract between Graham and Service Co. Title to the property was taken in the name of the Joint Venture. The Independence loan was secured by a mortgage

from the Joint Venture. The condominium regime was imposed by the Joint Venture. Contracts of sale on the individual units were made by the Joint Venture and signed by it.

Much of the Plaintiffs' argument consists of selecting bits of testimony describing what Berger or Davis did, contending that they were then acting as agents of S&L, and concluding that S&L thereby dominated and controlled Service Co. For example, the evidence is that Berger set the prices for sale of the units. However, the Joint Venture agreement states that "all decisions of the Joint Venture shall be made by a majority in interest in the Joint Venture, which effectively gives Yorkridge Service full and complete control . . . ." Berger was president of Service Co. Plaintiffs also say that the cash contributions to capital by the partners of the Joint Venture were too low for the project. But Service Co. assumed the obligations of a partner in a general partnership. There is no evidence that its resources were inadequate for the contemplated business activity. Indeed, all of the evidence and inferences are precisely to the contrary.

The degree of substance to the attack on Service Co.'s separate identity may be further gleaned from the remaining evidentiary points on which Plaintiffs have placed emphasis:

1. In a letter on the stationery of S&L, written by Davis to Independence and advising on the status of Starfish, Davis utilized "we."

2. A unit owner in July 1975 sent a letter of complaint to S&L.

3. Letters to purchasers of units covering the transmittal to them of their copy of the contract of sale, after it had been signed by the Joint Venture, were on the stationery of S&L and signed in the name of S&L.

4. When Graham transmitted bills from contractors to the Pikesville offices for payment, Graham consistently addressed his covering letter to Davis, as executive vice president of S&L. However, the bills were paid from the checking

account of the Joint Venture and the checkbook stubs were in evidence.

5. There was no written buy-sell agreement between S&L and Service Co., other than as appeared in corporate minutes, relating to purchase by S&L from Service Co. of the mortgages made by Service Co. to purchasers of units at Starfish.

6. The six pages of minutes for the meeting of the directors of S&L of April 14, 1975 include this passage:

> Mr. Berger brought to the attention of the Board that they are quite aware that Yorkridge Service Corporation had purchased several Ocean City condominium units in the past, and that they have been sitting due to the low market demand of Ocean City condominium units. And that he would like permission for the Service Corporation to offer to the public financing on the Ocean City units at 6.75 per cent for 25 years to stimulate sales. That upon the settlement by Yorkridge Service Corporation of said loans, that the Board would authorize the Association to purchase those loans at a discount of 3 per cent.

The minutes further reflect passage of the following resolution:

> Be it hereby resolved that the Board unanimously agrees to purchase from Yorkridge Service Corporation, mortgages up to $1,100,000 in total principal covering units at 126th and 127th Street, Ocean City, Maryland, at a discount of three per cent at times when the Service Corporation has settled mortgages in said units throughout the year.

The facts in the instant case may be compared to those in *Bart Arconti, supra.* Two individuals, A and B, owned three corporations, X, Y and Z, which were engaged in ceramic tile and masonry construction work. All three corporations

operated out of the same place of business, owned by X. All three shared the same equipment and employed the same workmen. X had a subcontract on each of three different projects for the same general contractor. The jobs were in trouble and substantial claims were being asserted against X by the general contractor. A and B permitted X to become dormant while the affairs of Y and Z improved substantially. X also made loans to A and B and transferred corporately owned insurance policies on the lives of A and B to them. The trial court, on the claim of the general contractor against X, also entered judgments against A, B, Y and Z. The trial court found that A and B had directed the operations of all three corporations with the intention of using Y and Z to keep the business of X but without leaving any real asset of X remaining in that corporation. We reversed and said that we were not aware of "any Maryland case where, on facts resembling those here, the Court has allowed the corporate entity to be disregarded merely because it wished to prevent an 'evasion of legal obligations' — absent evidence of fraud or similar conduct." 275 Md. at 311-12, 340 A.2d at 235.

Plaintiffs' proof in the instant case does not begin to approach that presented in *Bart Arconti,* where the evidence was insufficient as a matter of law to pierce the corporate veil. *See also Dixon v. Process Corp.,* 38 Md. App. 644, 382 A.2d 893 (1978), involving an unsuccessful effort to reach the parent corporation on a claim against its subsidiary.

In support of an alternative ground for imposing liability on S&L, Plaintiffs advance *Connor v. Great Western Savings & Loan Ass'n,* 69 Cal. 2d 850, 447 P.2d 609 (1968). There it was held, on the facts of that case, that a construction lender owed a duty to the original purchasers of homes in a housing project to exercise reasonable care to prevent the construction and sale of seriously defective homes. We express

no view on the rationale of that decision. It has no applica-
tion to the role of S&L in the construction at Starfish.

The judgment against S&L will be reversed.

> *Judgment of the Circuit Court for
> Baltimore County dismissing the
> complaint of Starfish Con-
> dominium Association is reversed
> and the matter remanded to that
> Court for further proceedings as to
> the defendants, Yorkridge-
> Graham Joint Venture No. II and
> Yorkridge Service Corporation,
> Inc., only.*

> *Judgments of the Circuit Court for
> Baltimore County against
> Yorkridge Federal Savings &
> Loan Association of Baltimore
> County reversed.*

> *Judgments of the Circuit Court for
> Baltimore County in favor of the
> plaintiffs enumerated below are
> reversed, and pursuant to Md.
> Rule 875 a are hereby modified to
> the amounts set forth next to the
> respective names of those plain-
> tiffs, said judgments to stand
> against the defendants,
> Yorkridge-Graham Joint Venture
> No. II and Yorkridge Service Cor-
> poration, Inc. only:*

> *Paul G. Morgan and
>   Selma Morgan   — $2,307
> Sandra L. Poms and
>   Claudia M. Smith   — $2,557*

*Godfrey F. Funk,*
*Jeanne Funk, William*
*M. Porter and Carol*
*Ann Porter* — *$2,336*
*Frank J. Needle* — *$2,361*
*Julie M. Lewinski* — *$2,307*
*and*
*William H. Pindell, Jr. — $2,334.*

*Judgments of the Circuit Court for Baltimore County in favor of the remaining plaintiffs against the defendants, Yorkridge-Graham Joint Venture No. II and Yorkridge Service Corporation, Inc. are affirmed.*

*Costs to be paid one-half by the plaintiffs and one-half by the defendants, Yorkridge-Graham Joint Venture No. II and Yorkridge Service Corporation, Inc.*