## Meadowbrook Condominium Association v. South Burlington Realty Corp.

[565 A.2d 238]

No. 85-563

Present: **Allen, C.J., Peck, Dooley and Mahady, JJ., and Barney, C.J. (Ret.), Specially Assigned**

Opinion Filed June 23, 1989

*Carl H. Lisman* and *Mary G. Kirkpatrick* of *Lisman & Lisman*, Burlington, for Plaintiff-Appellee.

*Martin K. Miller* and *Michael H. Lipson* of *Miller, Eggleston & Rosenberg, Ltd.*, Burlington, for Defendant-Appellant.

**Peck, J.** Defendant appeals from a judgment of the Chittenden Superior Court that awarded damages to plaintiff for, among other things, defects in certain "common areas" of the Meadowbrook Condominium in South Burlington. We modify the judgment and affirm on that basis.

In 1974, defendant South Burlington Realty Corporation (SBRC) began construction on the Meadowbrook Condominium project. Over the next four years, SBRC completed and sold thirty-one townhouse residential units.

Under the condominium plan, an individual purchaser obtains outright ownership of the interior of his or her unit only. The buildings and all of the other property in the project—including roads, carports, walkways, and open areas—are designated as "common areas," and each purchaser acquires an undivided interest in all of these areas. SBRC also constructed all of Meadowbrook's common areas.

The responsibility for care and maintenance of the common areas lies with the Meadowbrook Condominium Association (Association), a group made up of all of the unit owners. By statute, the Association may also institute legal actions, on behalf of two or more unit owners, with regard to the common areas. 27 V.S.A. § 1327.

On October 8, 1980, the Association filed suit in the superior court, alleging the existence of significant problems with the condominium's roads, carports, overall drainage, and sewer systems. The Association also claimed that SBRC had made representations to prospective purchasers that cable television service would be available and that no such service had ever been obtained. The complaint, as later amended, stated five causes of action against defendant: negligence, strict liability, breach of express warranties, breach of implied warranties, and consumer fraud.

After an extensive trial, the superior court found that significant defects existed in several areas, including the roads and the carports. The defective condition of the roads and carports was found to have been readily apparent "to anyone who cared to look" by September, 1979 or shortly thereafter.

The court then concluded that SBRC was liable for breach of implied warranties with respect to defects in the roads, carports, sewer systems, and drainage. The court also concluded that defendant was liable for its failure to install

cable television facilities under both breach of contract and consumer fraud theories. Compensatory damages were awarded in the amount of $71,250 for the roads, $22,500 for the carports, $35,600 for the overall drainage problems, $6,273 for the sewer systems, and $6,226 for the cost of obtaining cable television. The court also assessed $5,000 in punitive damages against SBRC under the consumer fraud statute for its actions relating to the cable television claim. Defendant brought the instant appeal, challenging the award of punitive damages as well as the assessment of damages relating to the roads and the carports.

## I.

Defendant begins by urging this Court to hold that the implied warranty theory relied upon by the trial court does not extend to the common areas of a condominium where the alleged defects do not affect the reasonable and ordinary habitation of the dwelling structures themselves. We decline to adopt such a limitation.

In *Rothberg v. Olenik*, 128 Vt. 295, 262 A.2d 461 (1970), this Court first considered a claim that, in selling a newly constructed house, the builder/vendor implicitly warrants to the buyer that the house is built in a good and workmanlike manner and is suitable for habitation. After an exhaustive review of case law from other jurisdictions, the Court rejected an argument based on the doctrine of caveat emptor and embraced the implied warranty concept as Vermont law. *Id.* at 305, 262 A.2d at 467. It is important to note that, while *Rothberg* did not address the issue, the law will recognize an implied warranty only with respect to defects that were latent at the time of purchase. *Redarowicz v. Ohlendorf*, 92 Ill. 2d 171, 183, 441 N.E.2d 324, 330 (1982); *Gupta v. Ritter Homes, Inc.*, 646 S.W.2d 168, 169 (Tex. 1983).

SBRC does not argue that the implied warranty doctrine is inapplicable to condominium sales, nor does it seriously contend that such a warranty cannot apply where defects in common areas are alleged. Instead, defendant maintains that the warranty extends only to those defects that affect the reasonable and ordinary habitation of the dwelling itself.

This argument obfuscates the distinction between the two warranties recognized in *Rothberg*: the warranty of habitability and the warranty of good workmanship. The cases cited by defendant illustrate this distinction. The primary authority SBRC relies upon in its brief, for example, is quoted without regard to context. It is true that, in *Aronsohn v. Mandara*, 98 N.J. 92, 484 A.2d 675 (1984), the high court of New Jersey held that a defective patio was not actionable under a theory of implied warranty of habitability, reasoning that the defect alleged did not affect the essential habitability of the home. *Id.* at 103–05, 484 A.2d at 681–82. But the court proceeded to remand the case for a new trial on the question whether the implied warranty of good workmanship had been breached. *Id.* at 106–07, 484 A.2d at 683. Thus, the case stands in direct contradiction to defendant's assertion that peripheral defects must affect the habitability of the dwelling in order to come under the umbrella of an implied warranty theory.

Similarly, SBRC cites *Briarcliffe West Townhouse Owners Ass'n v. Wiseman Construction Co.*, 118 Ill. App. 3d 163, 454 N.E.2d 363 (1983), in which the court opined that "[t]here may be circumstances in which a latent defect in the common land can affect the habitability of the living quarters." *Id.* at 167, 454 N.E.2d at 365. A complete reading of that case, however, reveals that the court was discussing a claim based on an implied warranty of habitability and one that involved vacant common land. Neither the facts nor the nature of the claim, therefore, are helpful to defendant here.

SBRC goes on to argue that the trial court was more concerned with quality standards than with function, and it contends in its brief that "Meadowbrook owners who wished to be assured that the construction of paved areas and carports would be in accordance with 'sound' engineering and construction standards were obligated to negotiate an express warranty to that effect in their deeds or by separate, surviving agreements." While we agree with defendant that *Rothberg* requires neither perfection nor buyer satisfaction, we observe that the quoted proposition is antithetical to *Rothberg*'s adoption of an implied warranty of "good and workmanlike" building techniques. Here, the trial court's findings respecting the condition of the roads and carports provided adequate

support for its conclusion that the implied warranty of good workmanship had been breached.

■ In sum, defendant has failed to demonstrate that the trial court erred either in its reliance upon or in its application of an implied warranty theory of liability.

## II.

In the alternative, SBRC contends that the trial court erred by refusing to apportion the damages awarded for the defective roads and carports in a manner that would limit recovery to those unit owners to whom defendant was actually liable. Defendant's argument is based on the trial court's finding that many of the individual owners purchased their units after September, 1979, when the defects in the roads and carports had become apparent. Because *Rothberg*'s implied warranties apply only where structural defects are latent at the time of sale, defendant maintains that these latter purchasers are not entitled to damages. We agree.

The apportionment argument arises, in part, because of the representative nature of the lawsuit. The Association, the nominal plaintiff, brought the action under the terms of 27 V.S.A. § 1327, which provides, in pertinent part:

> Without limiting the rights of any apartment owner, actions may be brought by the manager or board of directors ... on behalf of two or more of the apartment owners, as their respective interests may appear, with respect to any cause of action relating to the common areas and facilities of more than one apartment....

The trial judge ruled that this statute:

> [A]llows the ... Association to stand in the shoes of individual owners with individual legal claims. In that respect, the standing of the Association to sue is derivative in nature. [The Association] does not enjoy a separate right to recover. Its claim in this suit is only as good as that of its constituent members.... [C]oncomitantly, the homeowners' association can recover only those damages to which individual apartment owners are entitled.

Hence, determination of the damages issue requires examination of the owners' individual legal claims.

Although the trial court did not rule directly on the question, it appears to have agreed with defendant that those owners who purchased their units after defects in the roads and carports had become apparent were not entitled to recovery of damages. Nevertheless, the court rejected defendant's apportionment argument, opining that "each apartment owner at Meadowbrook has an undivided interest in the common elements and should be entitled to complete restoration when liability is shown." We hold that the trial court erred in this respect.

With respect to the common areas of a condominium, the individual unit owners are tenants in common under the law. *Starfish Condominium Association v. Yorkridge Service Corp.*, 295 Md. 693, 702, 458 A.2d 805, 810 (1983). The narrow issue, therefore, is whether a tenant in common may recover the whole of any damages assessed in a breach of warranty action involving real property. If so, then defendant's apportionment argument here would fail because any one of the owners who purchased before the defects became patent could recover the entire repair cost of the roads and carports.

While no definitive answer to this question appears in the literature, the following general principle can be derived from the authorities: Where monetary damages are involved, a tenant in common, acting alone, may recover only his or her fractional share. See *Jablonsky v. Klemm*, 377 N.W.2d 560, 569–70 (N.D. 1985) (citing 4A Powell, The Law of Real Property § 606, at 625–27 (1982)); see also *Jefferson Lumber Co. v. Berry*, 247 Ala. 164, 168, 23 So. 2d 7, 10 (1945) (while plaintiff could not recover damages with respect to his cotenant's interest, he could sue for and recover his proportionate share of the damages suffered); *Werner v. Quality Service Oil Co.*, 337 Pa. Super. 264, 269, 486 A.2d 1009, 1012 (1984) (cotenant can maintain an action to recover monetary damages for injury done to his interest in the property); *Hicks v. Southwestern Settlement & Development Corp.*, 188 S.W.2d 915, 921 (Tex. Civ. App. 1945) ("each tenant in common is only entitled to the possession of his own share of the damages"); and 4 G. Thompson, Commentaries on the Modern Law of Real Property § 1816, at 257 (replacement ed. 1979) ("where there

is injury to the realty each cotenant can sue individually to recover his particular share").

In *Jablonsky*, the Supreme Court of North Dakota considered a situation remarkably similar to the instant case. There, a condominium association brought suit against the project's developer, alleging that a retaining wall located behind the residential units had failed. The trial court found for the plaintiffs on theories of negligence and implied warranty, but it apportioned the damages and denied recovery to those owners who had purchased their units with notice of the defective retaining wall. On cross-appeal, the high court rejected plaintiffs' argument that the apportionment was erroneous. *Jablonsky*, 377 N.W.2d at 569–70. In response to plaintiffs' contention that, as cotenants, each of them would have had a right to maintain an action for the entire amount of the damage, the court merely observed that: " 'It is ... permissible for a single cotenant to sue for his fraction of the damages inflicted on his fraction of ownership in a case *where the other cotenants have consented to the wrongful action by the outsider, thereby barring themselves from sharing in any recovery.*' " *Id.* at 569–70 (quoting 4A Powell, *supra*, § 606, at 625–27) (emphasis in original). In sum, *Jablonsky* stands for two, closely related propositions: (1) a single cotenant has no right to recover the entire amount of damages relating to the cotenancy, and (2) apportionment of damages is therefore proper where fewer than all of the condominium unit owners are entitled to recover against a particular defendant for damages to the common area.

The trial court relied upon four cases from other jurisdictions in support of its holding that apportionment of damages would be improper in the present case. The first of these cases, *Stony Ridge Hill Condominium Owners Ass'n v. Auerbach*, 64 Ohio App. 2d 40, 410 N.E.2d 782 (1979), involved allegations that the developer had misrepresented the defective roof of the condominium as a "twenty-year roof." Because the alleged misrepresentations had been made to only four of the twenty-four unit owners, the court faced the question of apportionment. The court opined that each of the four owners who had purchased in reliance on the misrepresentation "has a right to have the whole damage to the entire common area of the building remedied and completely satisfied." *Id.* at 43, 410

N.E.2d at 785. Otherwise, the court stated, "the consequent repair of only one-sixth of the roof would still leave the roof in the same leaky condition, and would be the equivalent of giving plaintiff no legal remedy or relief whatever." *Id.* at 44, 410 N.E.2d at 786.

In *Drexel Properties, Inc. v. Bay Colony Club Condominium, Inc.*, 406 So. 2d 515 (Fla. Dist. Ct. App. 1981), the court refused to apportion damages awarded with respect to defective or substandard fencing and ceiling roof assemblies. Although the court held that only original purchasers could recover under an implied warranty theory, it allowed the recovery of full damages because " [t]o conclude otherwise and apportion the damages would penalize the original purchasers.... [T]o receive the benefit of their bargain and be made whole, the amount of damages awarded must equal the sum necessary to correct the condition." *Id.* at 519–20.

The Court of Appeals of Maryland considered the apportionment question indirectly when it held that a statutory amendment giving standing to condominium unit owners' associations could be applied retroactively. *Starfish Condominium Association v. Yorkridge Service Corp.*, 295 Md. at 706–09, 458 A.2d at 812–13. Citing *Stony Ridge Hill* and *Drexel Properties,* the court reasoned that the defendant developers were not deprived of any vested rights by this retroactive application because any one of the original unit purchasers could have sued before the statutory amendment and recovered the entire damages to the common elements. *Id.* at 708, 458 A.2d at 813.

Finally, although it did not decide the question, the Illinois Court of Appeals discussed the apportionment issued in *Tassan v. United Development Co.*, 88 Ill. App. 3d 581, 410 N.E.2d 902 (1980). Responding to the defendant developer's argument that the implied warranty of habitability does not extend to second purchasers, the court first noted that the defects alleged were in the common areas. The court went on to state that:

> [I]t would appear that each original purchaser would be entitled to have all of the common elements repaired completely if there is shown a breach of an implied warranty of habitability .... We have difficulty discern-

ing how we could separate the interests of the original purchasers in the common elements from the interests of the second purchasers in the common elements.

*Id.* at 594–95, 410 N.E.2d at 913.

We begin by noting that, unlike *Jablonsky*, none of these four cases involve the latent/patent defect question that is the central issue before us. While it is possible that the equitable considerations relied upon by these four courts might be persuasive in other contexts, they are not controlling. here.

First, those owners to whom defendant is liable on an implied warranty theory—i.e., those who purchased their units before the defects complained of became apparent—will receive sufficient monetary damages, despite apportionment, to cover their shares of the repair costs. Second, the Association is charged with the responsibility of maintaining the roads and carports and for collecting the required sums from its constituents. The Association will collect the damage awards from those owners who recovered and equal amounts from those who did not. This latter group will not be penalized unfairly because the purchase price of their units presumably reflected the existence of the patent defects. See *Aronsohn*, 98 N.J. at 100, 484 A.2d at 679. Hence, the roads and carports will be repaired, and the injured unit owners will have their remedy.[1]

To the extent that the four cases relied upon by the trial court stand for the proposition that an individual owner may sue a developer for the entire damages with respect to defects in common areas, we refrain from following them. We perceive no reasoned basis, given these facts, for departing from the common law of property and cotenancy principles.

█ We hold that the superior court erred in refusing to apportion damages. The court found that fifty-five percent of the condominium owners purchased their units after September, 1979, when the defects at issue had become apparent.

---

[1] Nor does our holding on this issue necessarily mean that defendant will escape payment of the full amount of damages. Those owners who sold their units after the defects in the roads and carports had become obvious—and who, presumably, were forced to accept a lower price as a consequence— did not thereby waive their individual causes of action.

Therefore, the damages awarded for the roads and carports must be reduced by that percentage.

## III.

Defendant next challenges the trial court's finding that the approximate cost of repairing the roads in the condominium will be $60,000, arguing that the record contained no evidence on which this sum could be based. We disagree.

■ On review, a trial court's finding of fact will not be set aside unless it appears to be clearly erroneous when the supporting evidence is viewed in the light most favorable to the prevailing party and any modifying evidence is disregarded. *Peckham v. Peckham*, 149 Vt. 388, 390, 543 A.2d 267, 268–69 (1988). At trial, plaintiff's expert testified that the cost of repairing the roads, including excavation and repaving, would be $105,000. Defendant's expert, on the other hand, testified that little excavation would be needed and that most of the necessary repairs could be effected through lesser measures such as application of asphalt overlays. This witness testified further that the cost of repair, carports included, would be $41,000.

Defendant maintains that, once the court had rejected the only evidence that the Association had offered as to cost of repair, i.e., the $105,000 figure, the court was obligated either to: (1) conclude that the Association had not carried its burden of establishing the amount of damages, or (2) find that the repair cost would be $41,000, based on the only other evidence presented.

■■ In resolving this issue, our review of the record need go no farther than the court's unchallenged findings regarding the necessary repairs. These findings reflect an obviously painstaking analysis by the trial court, which was presented with an abundance of contradictory, technical testimony by opposing expert witnesses. The Association's expert concluded that a proper repair effort would require that all of the roads in the development be taken up so that the subsurface could be excavated and replaced. The witness for SBRC, on the other hand, testified that little excavation was needed and that most of the necessary repair could be effected either by filling and application of an overlay of asphalt or by application of a

"shim coat" followed by an overlay. Rather than accepting either of these extreme positions, the court found that excavation would be required in three specific areas and that shim coats with an overlay would be sufficient elsewhere. This more discriminating analysis resulted in a cost estimate that was also between the two extremes proposed by the expert witnesses. "Evidence that provides reasonable certainty in the estimation of damages is 'sufficient to call for the exercise of sound judgment and to require a decision.' " *Coty v. Ramsey Associates*, 149 Vt. 451, 462, 546 A.2d 196, 204 (1988) (quoting *Hinesburg Sand & Gravel Co. v. Town of Hinesburg*, 135 Vt. 484, 487, 380 A.2d 64, 67 (1977)). The trial court's finding with respect to the cost of repair was not clearly erroneous.[2]

## IV.

Defendant's final claims of error relate to the trial court's award of damages under Vermont's Consumer Fraud Act, 9 V.S.A. § 2451 et seq., for its failure to obtain cable television service for the condominium. First, defendant attacks the court's holding that the "private action" provision of the Act is applicable here, contending that the provision does not apply to purchases of residential real property. Second, defendant argues that, irrespective of the Act's applicability, the punitive damages award was improper because the court did not find that the requisite "actual malice" had been established.

The trial court assessed $6,226 in compensatory damages against SBRC because of its failure to obtain the cable television service it had promised to prospective purchasers. Defendant maintains that this award must be reversed, arguing that the Act on which it was based was improperly applied. We need not resolve this issue, however, because the court explicitly grounded the compensatory damages award on a breach of contract theory as well as on the Consumer Fraud Act. SBRC does not challenge the breach of contract basis for the compensatory damages award.

The superior court also invoked the Act in awarding punitive damages, opining that "the sum of $5,000 is a reasonable award to the Plaintiff for a wilful violation of the

---

[2] Our resolution of this issue renders consideration of defendant's "double recovery" argument unnecessary.

Consumer Fraud Act." Again, we do not reach the issue of the Act's applicability because we hold that the punitive damages award must be vacated on an independent ground.

In *Bruntaeger v. Zeller*, 147 Vt. 247, 515 A.2d 123 (1986), this Court held that, under 9 V.S.A. § 2461(b), a consumer must prove the existence of actual malice in order to recover punitive damages. *Id.* at 253–54, 515 A.2d at 127. At a minimum, plaintiff must establish " 'conduct manifesting personal ill will or carried out under circumstances evidencing insult or oppression, or ... a reckless or wanton disregard of one's rights.' " *Coty*, 149 Vt. at 464–65, 546 A.2d at 205. Here, the trial court found that defendant did not obtain cable television service for the condominium because of an unwillingness to make the necessary expenditures. The court proceeded to make the punitive damages assessment "for a wilful violation" of the Act. We hold that defendant's conduct in this matter, however wrongful, did not evince the degree of malice required under *Bruntaeger* and *Coty*. The punitive damages award, therefore, must be vacated.

*The compensatory damages award for defects in the roads and carports is reduced to $42,187.50, and the punitive damages award is vacated. As modified, the judgment and order are affirmed.*

**Mahady, J.,** concurring and dissenting. I respectfully dissent from Part II and Part IV of the majority's opinion. As such, I would affirm the judgment of the trial court without modification.

The Court today promulgates a rule requiring an apportionment of damages under the facts of this case. The weight of authority is clearly to the contrary recognizing that a single-unit owner may recover all damages relating to the common areas. See, e.g., *Starfish Condominium Ass'n v. Yorkridge Service Corp.*, 295 Md. 693, 458 A.2d 805 (1983); *Tassan v. United Development Co.*, 88 Ill. App. 3d 581, 410 N.E.2d 902 (1980); *Stony Ridge Hill Condominium Owners' Ass'n v. Auerbach*, 64 Ohio App. 2d 40, 410 N.E.2d 782 (1979).

Each unit owner is entitled to an undivided interest in the common areas and facilities which remains undivided unless the entire property is removed from condominium ownership. 27 V.S.A. § 1306(c). Each such owner is entitled to a

conveyance to the property owners' association of the common areas completed in a workmanlike manner. Unless this is accomplished, such an owner under the facts of this case cannot be made whole. The effect of the majority's opinion is to penalize those unit owners who are entitled to such a recovery. *Drexel Properties, Inc. v. Bay Colony Club Condominium, Inc.*, 406 So. 2d 515, 519–20 (Fla. Dist. Ct. App. 1981). The law should be more solicitous of these innocent consumers than of the tortfeasor-developer.

Moreover, the evidence supported an award of punitive damages by the trial court. That court found that the defendant refused to honor its contractual obligation concerning the provision of cable television service simply because it was unwilling to make the necessary expenditures. The trial court was fully justified in concluding that the defendant's conduct amounted to "a ... wanton disregard of [the plaintiff's] rights." See *King v. Brace*, 150 Vt. 222, 225, 552 A.2d 398, 399 (1988).

I would affirm.