**Victor and Mary Coty, Donald and Dorothy Nelson d/b/a Stowe Country Shop and Anton and Pamela Flory d/b/a Die Alphen Rose Motel v. Ramsey Associates, Inc.; Normand Ramsey and Raymond Ramsey**

[546 A.2d 196]

No. 85-399

Present: **Peck and Dooley, JJ., and Barney, C.J. (Ret.), Keyser, J. (Ret.) and Costello, D.J. (Ret.), Specially Assigned**

Opinion Filed February 12, 1988

Motion for Reargument Denied March 17, 1988

*Harold B. Stevens* of *Stevens & Vogl*, Stowe, for Plaintiffs-Appellees.

*Robert D. Rachlin* and *Michael J. Gannon* of *Downs Rachlin & Martin*, Burlington, and *Peter L. Murray* and *Thomas C. Newman* of *Murray, Plumb & Murray*, Portland, Maine, for Defendants-Appellants Ramsey Associates, Inc., and Normand Ramsey.

*William B. Gray* and *Michael O. Hill* of *Sheehey, Brue & Gray*, Burlington, for Defendant-Appellant Raymond Ramsey.

**Peck, J.** In the underlying nuisance action, plaintiffs alleged that defendants had established a highly offensive pig farm on a parcel of land in Stowe in retaliation for their opposition to a motel that defendants had planned to build on the site. Plaintiffs were residents and small business proprietors owning land immediately adjoining or across the road from the farm.

The suit was based on theories of nuisance and trespass. After a bench trial, the court awarded plaintiffs compensatory and punitive damages and enjoined any further unreasonable farm operations. Defendants appealed to this Court; we affirm in part and reverse in part.

Defendants filed separate briefs on appeal, raising a multitude of issues for our consideration. First, they claim that the trial court failed to apply the correct legal standard in the nuisance determination, arguing that any interference with plaintiffs' use and enjoyment of their properties was brief and insubstantial; that neither unsightliness nor malice is a proper basis for a finding of nuisance; and that the evidence adduced at trial was insufficient to support the court's conclusion. Defendants also attack the award of punitive damages, contending that the evidence does not support a finding of actual malice, that the award was excessive and violates both state and federal constitutions. Defendant Raymond Ramsey argues that the trial court failed to provide clear statements of the method used in assessing damages and of the weight accorded to the various factors. Finally, defendant Normand Ramsey complains that plaintiffs Anton and Pamela

Flory were not entitled to bring an action in the name of their motel because they had not registered to do business in the motel's name.

Normand Ramsey is the president and sole shareholder of defendant Ramsey Associates, Inc. (corporation), and his son, Raymond Ramsey, is the vice-president. The corporation owns and operates two large farms, a chain of motels, a nursing home, and an automobile supply store. In 1981, Normand Ramsey purchased, in the name of the corporation, an open tract of land along the Mountain Road in the town of Stowe. In the following year, Raymond Ramsey, also acting in the corporation's name, applied for an Act 250 permit to construct a seventy-nine unit motel on the parcel.

Plaintiffs Victor and Mary Coty reside on property adjoining the pig farm. Plaintiff Dorothy Nelson owns a gift and gourmet food shop, and plaintiffs Anton and Pamela Flory own a motel and residence; the Nelson and Flory properties are situated across the road from the farm. Plaintiffs formed a committee to oppose the planned motel and attempted to purchase the land, a large open meadow, for preservation purposes. Defendants, however, refused to sell.

In late October, 1982, construction of a motel on the site was approved under Act 250, but the approval was limited to fifteen units rather than the seventy-nine proposed. Defendants were disturbed by this ruling, and they began preparations to establish an extensive pig farm on the land. Raymond Ramsey, acting on behalf of the corporation, applied successfully for a zoning permit to operate the farm, a permitted use under the provisions of Stowe's zoning ordinance.

Shortly after the Act 250 ruling was received, a large, rusty storage tank was placed in the meadow. This tank was never used. A few days later, the Ramseys and some workmen erected a fence around the parcel. When Mrs. Coty inquired as to the purpose of the fence, Normand Ramsey replied tersely: "Pigs!" On November 2 and 3, approximately sixteen truckloads of wet chicken manure, averaging thirteen cubic yards each, were dumped along a narrow strip directly across from the Nelson and Flory properties. The truck drivers had been instructed by Normand Ramsey to dump the manure along this particular strip, and Raymond Ramsey directed the dumping of the first truckload. The drivers used the Florys' driveway to turn their vehicles

around, and both the driveway and the road were covered with manure. The dumping was halted when a temporary restraining order was served upon one of the drivers, who told police that the Ramseys had finally "gotten even" with plaintiffs.

At the subsequent hearing, the Ramseys testified that the manure would be used as fertilizer over an area of four acres, and the court declined to issue a preliminary injunction. However, the mounds of manure were merely leveled off within an area of one-half acre. In the spring of 1983, approximately eleven to thirteen more truckloads of chicken manure were delivered, and most of these loads were deposited along the same strip of land. An expert produced by the plaintiffs testified, and the court found, that the resulting supply of fertilizer was so grossly in excess of the recommended application that it would kill any attempted crop. The manure encouraged an infestation of flies that plagued plaintiffs' properties during the spring, summer, and fall of 1983 and 1984. A powerful stench also engulfed the area, eventually requiring the Florys to purchase air conditioners for their motel.

In late November of 1982, approximately one hundred pigs and cows were delivered to the property along with a house trailer and ten or more junked automobiles. The animals were fed at a place closest to plaintiffs' properties. In December of 1982, defendant Normand Ramsey telephoned Mrs. Nelson on two occasions and told her that serious consequences would follow if she continued her opposition to the motel.

During the winter of 1982, the animals had inadequate shelter, food and water and, as a result, became sick and lame. Mrs. Nelson made an offer to provide water, but was turned down. Animals died, and decomposing carcasses were left lying around.

With variations, the conditions that began in November, 1982 continued up until the spring of 1985. The manure delivery in 1983 resulted in manure that was over three feet deep in places. The smell and resulting flies continued through 1984.

Because the pigs were not properly separated, the boars mingled with the piglets and attacked them. Roosters were penned together so that they pecked each other to death. By the fall of 1984, the property contained over two hundred sickly animals along with over twenty carcasses of dead pigs, piglets, sheep and a goat. The dead animals were finally placed in an uncovered pit. Many of the piglets born in the winter of 1984-85 died; eight to ten burlap bags filled with piglet carcasses were removed. Nor-

mand Ramsey knew of these conditions and took few, if any, steps to improve them until just before the case came to trial. The trial court found that defendants "used the pretext of operating a farm to abuse and kill animals which itself had no purpose other than to intentionally annoy, upset and harass plaintiffs and to cause them economic injury."

Public curiosity was stimulated by the piggery, and traffic became congested in front of plaintiffs' properties. Tourists would often trespass upon plaintiffs' land in order to view and photograph the spectacle, and defendants issued an instruction sheet to farmhands regarding the treatment of tourists.

In addition, Mrs. Nelson's well and springs were polluted as a result of the excessive manure. At one point, defendants obtained a discovery order as part of their attempt to obtain approval for the motel. The order compelled Mrs. Nelson to allow the drilling of six test wells on her property so that the state could monitor any pollution. She refused and obtained a protective order. Plaintiffs testified that many pigs were slaughtered on the morning after the protective order was issued.

Defendants invested about $50,000 in the farm, excluding the purchase price of the land. No pigs were ever sold or marketed for their income.

Conditions greatly improved shortly before the case came to trial. The animals began receiving regular veterinary care along with adequate shelter and provisions. The number of pigs on the property was greatly reduced and healthy pigs arrived to replace sickly ones. The storage tank was screened and the junk cars removed. The trial court concluded that the farm could have been operated with no deleterious effects on the plaintiffs. The court found that defendants' operations caused each of the plaintiffs to lose the full use and enjoyment of their land, to suffer emotional distress and, in the case of the Florys and Mrs. Nelson, to lose business income.

On the basis of these and other facts, along with the inferences drawn from them, the trial court concluded that the operation of the farm constituted a nuisance which infringed unreasonably upon plaintiffs' full use and enjoyment of their properties, and the court enjoined further operations not in accordance with proper husbandry practices. The court also concluded that the Florys and Mrs. Nelson had suffered a trespass as a result of the manure spilled on their properties and the pollution of Mrs. Nel-

son's well and springs. Defendants were enjoined from further trespasses. On the basis of detailed findings regarding each plaintiff's situation and the defendants' assets, the court awarded the following damages: $40,000 in compensatory damages and $80,000 in punitive damages to the Cotys; $70,500 in compensatory damages and $150,000 in punitive damages to Mrs. Nelson; and $77,161 in compensatory damages and $150,000 in punitive damages to the Florys.

## I.

Defendants' initial claim on appeal is that the trial court erred, as a matter of law, in determining that the farm operations constituted a nuisance. They contend that the court based its conclusion on conditions that were too brief and insubstantial to rise to the level of legal nuisance.

In order to be considered a nuisance, an individual's interference with the use and enjoyment of another's property must be both unreasonable and substantial. *Dunlop* v. *Daigle*, 122 N.H. 295, 298, 444 A.2d 519, 520 (1982); W. Prosser, Law of Torts § 87, at 577-80 (4th ed. 1971). The standard for determining whether a particular type of interference is substantial is that of "definite offensiveness, inconvenience or annoyance to the normal person in the community . . . ." Prosser, *supra*, at 578. "Substantial harm is that in excess of the customary interferences a land user suffers in an organized society." 6-A American Law of Property § 28.25, at 73 (A.J. Casner ed. 1954). The trial court's findings regarding the degree of interference in the instant case are extensive and will not be detailed here. We hold, however, that they are adequately supported by credible evidence; accordingly they must stand. *Trustees of Net Realty Holding Trust* v. *AVCO Financial Services of Barre, Inc.*, 144 Vt. 243, 246, 476 A.2d 530, 532 (1984). Under either of the above standards, the operation of the pig farm constituted a substantial interference with plaintiffs' use and enjoyment of their properties.

Nor was the interference too brief to be considered a nuisance. The duration of a particular condition is an important factor in determining whether the interference caused is sufficiently substantial to be deemed a nuisance, but it is not a dispositive one. Prosser, *supra*, at 580. In any event, the continuing nature of the offensive farm operations is clear from the evidence and the

findings. The unreasonable use of the Ramsey property persisted for over two and one-half years, abating only when trial was about to commence. Although certain aspects of the nuisance varied in their intensity with the seasons, the overall condition of the piggery remained constant.

■ Defendants also contend that the trial court wrongly relied upon the unsightliness of their farm in declaring it a nuisance. As a general rule, the unsightliness of a thing, without more, does not render it a nuisance under the law. See *Woodstock Burying Ground Association* v. *Hager*, 68 Vt. 488, 489, 35 A. 431, 432 (1896). Some evidence of a trend away from this rule can be found in other jurisdictions. See, e.g., *Hay* v. *Stevens*, 271 Or. 16, 530 P.2d 37 (1975); see also Note, *Aesthetic Nuisance: An Emerging Cause of Action*, 45 N.Y.U.L. Rev. 1075 (1970). However, we need not deliberate about the rule's continuing viability because this case involved more than mere unsightliness.[1] The trial court's nuisance determination was based in large part upon the odors, the flies, and the offensive animal husbandry practices.

■ The trial court's opinion makes clear, moreover, that the weightiest factor in its analysis was defendants' malicious motive. The court found that the conditions complained of were created intentionally, under circumstances indicating "extreme ill will and insult." In another finding, the court stated that defendants "used the pretext of operating a farm to abuse and kill animals which itself had no purpose other than to intentionally annoy, upset and harass plaintiffs and to cause them economic injury." On appeal, defendants note that the farm was an approved use of the land under Stowe's zoning regulations, and they maintain that an improper motive does not convert an otherwise lawful act into an unlawful one.[2] But the great majority of jurisdictions have held that where a defendant has acted solely out of malice or spite, such conduct is indefensible on social utility grounds, and nuisance liability attaches. Prosser, *supra*, § 89, at 598-99. In

---

[1] We observe that the interferences complained of in the so-called "spite fence" cases are often limited to aesthetics. See, e.g., *Welsh* v. *Todd*, 260 N.C. 527, 133 S.E.2d 171 (1963). The circumstances of this case demonstrate that a "spite farm" can produce far greater interferences than can a spite fence.

[2] In 1981, legislation was enacted for the express purpose of shielding reasonable agricultural activities from nuisance lawsuits. See 12 V.S.A. §§ 5751-5753. The activities at issue here are far removed from the sphere of the statutory protection.

sum, the lower court was correct as a matter of law in concluding that the operation of the piggery constituted an actionable nuisance.

## II.

■ Many of defendants' arguments center upon the evidence presented at trial. They urge that this evidence supports neither the trial court's findings of fact nor its ultimate conclusion that a nuisance had been established.

This Court assumes a deferential role in reviewing a trial court's findings of fact: a finding will not be set aside unless, when the supporting evidence is viewed in the light most favorable to the prevailing party and the effects of modifying evidence are excluded, it is clearly erroneous. *Bruntaeger* v. *Zeller*, 147 Vt. 247, 250, 515 A.2d 123, 125 (1986). Furthermore, unless the party objecting to a particular finding was harmed by the alleged error, the objection will not be considered. *Hogel* v. *Hogel*, 136 Vt. 195, 198, 388 A.2d 369, 370 (1978).

We have scrutinized the voluminous trial transcript, and we are satisfied that most of the challenged findings are grounded upon credible evidence. Defendants direct our attention to contrary evidence in the record, but consideration of this evidence is precluded by the applicable standard of review. With the exception of certain findings relating to Raymond Ramsey, which will be discussed later in this opinion, any minor errors in the court's findings are harmless.

In several instances, defendants argue in the alternative that a particular finding does not provide sufficient ground for a holding of nuisance. But these contentions are simplistic, concentrating on the subject matter of a specific finding in isolation and ignoring the significance of cumulative interferences. The trial court did not base its conclusion of law on any one factor or incident; instead, its decision was grounded on the totality of all the circumstances involved in the continuing pattern of unreasonable farming and husbandry practices. We conclude that the trial court's ultimate nuisance determination is supported by the evidence and by the findings of fact.

## III.

The trial court's award of compensatory and punitive damages in this case was a major source of debate on appeal. Distillation of the many claims of error reveals four primary issues: (1) whether the trial court failed to include a clear statement of the method employed in assessing damages, (2) whether the court erred in computing compensatory damages, (3) whether the court erred in awarding punitive damages in the light of the evidence presented at trial, and (4) whether the punitive damages award is excessive under case law or under the terms of the Eighth Amendment.

### A.

■ Defendant Raymond Ramsey maintains that the trial court failed to include a clear statement of the method used in assessing damages and of the weight given to the various factors in its analysis. "The purpose of findings is to provide a clear statement as to what was decided and why; where no indication appears of the method employed and weight accorded various factors, remand is necessary." *Richard* v. *Richard*, 146 Vt. 286, 287, 501 A.2d 1190, 1190-91 (1985). In *Hilder* v. *St. Peter*, 144 Vt. 150, 478 A.2d 202 (1984), a case involving a dispute between landlord and tenant, this Court reversed a judgment awarding $1500 in "additional compensatory damages" because the lower court did not indicate how it had reached that figure. *Id.* at 164-65, 478 A.2d at 211. Although the court's findings clearly demonstrated the appropriateness of awarding these additional damages in *some* amount, the case was remanded for a hearing and findings on what that amount should be. Here, in contrast, the trial court made no less than twenty-six findings of fact as groundwork for the damages analysis. In a discussion of its conclusions, moreover, the court included a painstaking explanation of the applicable theories of liability and damages. The court's final order incorporates a complete itemization of the damages awarded and the basis for each portion of the award. The sole shortcoming of any significance relates to the theories of liability: although the trial court concluded that two of the plaintiffs had suffered a trespass, no damages were awarded on this basis.[3] Defendant claims revers-

---

[3] We need not decide whether the court erred in making no finding of agency with regard to the truck drivers who spilled the manure upon the Florys' property.

ible error, but this is not a case where it is difficult to determine under what theory damages were awarded. Cf. *Page* v. *Smith-Gates Corp.*, 143 Vt. 280, 283, 465 A.2d 1102, 1104 (1983). Instead, the court's order makes clear that each element of damages was awarded under a nuisance theory. While an express indication that no trespass damages were being awarded might have been preferable, defendant was not prejudiced by the court's failure to do so.

B.

■ The trial court awarded plaintiffs a total of $187,661 in compensatory damages, and Raymond Ramsey argues that the court made several errors in the course of its computations. He begins with the contention that the court improperly considered unsightliness as a factor, but this argument fails in light of our earlier holding on this issue. Defendant then attacks the trial court's award of lost-use damages, which were determined by assessing lost rental values, to plaintiffs Nelson and the Florys. He maintains that the court erred by taking the amount of lost rental value occurring in those months when the nuisance elements of flies and odors were at their worst and multiplying that amount by thirty-one, the total number of months that the nuisance continued. The flies and odors were not the only aspects of the continuing nuisance, however, and the court's findings that the decreases in rental values persisted over the entire period of the nuisance are not clearly erroneous. Furthermore, where the nature of a particular cause of action is not conducive to exact computation of damages, an award will withstand review unless it is grossly excessive. *Birkenhead* v. *Coombs*, 143 Vt. 167, 173, 465 A.2d 244, 247 (1983). Here, the trial court's award of $15,500 to Mrs. Nelson and $9,300 to the Florys in compensation for the lost rental values of their respective properties was not excessive and must be upheld.

■ Defendant also urges that the lower court's computation of the compensatory damages due to plaintiff Nelson was flawed by an award of $5,000 for the installation of a water purifier. He argues that the testimony relied upon by the court as to costs was beyond the scope of cross-examination and constituted a "guess"

---

Any such error would be harmless in light of the fact that no damages were assessed for trespass.

by the witness. As the transcript indicates, the trial court acknowledged that the testimony in question, offered by plaintiffs' expert on real estate values, was beyond the scope of cross-examination. The testimony was admitted, nevertheless, because the court had assumed an active role in questioning the witness on cross-examination and because considerations of fairness required that plaintiffs' counsel be allowed to elicit testimony on the points covered. The trial court enjoys a great deal of discretion in controlling the interrogation of witnesses and the presentation of evidence, and we find no error here. See V.R.E. 611(a); *Bevins v. King*, 147 Vt. 203, 207, 514 A.2d 1044, 1047 (1986). Also, while plaintiffs' expert admitted that his $5,000 estimate was a guess, he stated that the figure was "based on my experience with water systems; and "[m]y own exposure to water conditioning in the area." The transcript makes clear that the entire discussion of water purification centered around the expert's appraisal of plaintiff Nelson's real property and the effect that water pollution would have on that appraisal. Evidence that provides reasonable certainty in the estimation of damages is "sufficient to call for the exercise of sound judgment and to require a decision." *Hinesburg Sand & Gravel Co. v. Town of Hinesburg*, 135 Vt. 484, 487, 380 A.2d 64, 67 (1977).

■ Defendant's fourth point regarding the compensatory damages award concerns the mitigation of damages. He argues that the lower court failed to consider two mitigating factors: (1) on their federal income tax returns, the Florys depreciated the cost of air conditioners purchased to control odor in their motel, yet they were awarded their full cost in the form of compensatory damages, and (2) the use of these air conditioners reduced the harm that the Florys would have otherwise incurred. As to the first of these contentions, any tax benefit received by the Florys as a result of their purchase of the air conditioners was derived from a collateral source, i.e., the United States government. The "collateral source rule" allows a plaintiff full recovery against a tortfeasor even where he is otherwise compensated by a source independent of the tortfeasor. *My Sister's Place v. City of Burlington*, 139 Vt. 602, 612, 433 A.2d 275, 281 (1981); see also *Felder v. United States*, 543 F.2d 657, 670 n.17 (9th Cir. 1976) (distinguishing between government as independent source and government as tortfeasor). Any tax benefit received by plaintiffs is a matter solely between them and the taxing authority. *Cereal By-*

*products Co.* v. *Hall,* 16 Ill. App. 2d 79, 81, 147 N.E.2d 383, 384, *aff'd,* 15 Ill. 2d 313, 155 N.E.2d 14 (1958); *Wiesenberger* v. *W.E. Hutton & Co.,* 35 F.R.D. 556, 558 (S.D.N.Y. 1964). If we considered the significance of such tax benefits, then we would also have to consider the diminution of damages awards by taxation. There was no error in disregarding this extraneous issue.

Furthermore, although the air conditioners may have had some ameliorating effect upon the odor problem, it does not follow that damages were mitigated. All but one of the units were purchased for the Florys' motel. The trial court's calculation of lost use value for the motel was based on an actual decrease in room rentals, and this decrease occurred despite the existence of the air conditioners. The Florys did install one of the window units in their four-bedroom home, but we cannot say that any minimal mitigation represented by this unit was overlooked in the computation of damages. Mrs. Flory testified that in her opinion the rental value of her home had decreased by $300 per month, and the trial court accepted this evidence. Mrs. Flory was competent to testify regarding the value of her property, and the weight afforded to her opinion was a matter for the trier of fact. See *Shortle* v. *Central Vermont Public Service Corp.,* 134 Vt. 486, 489, 365 A.2d 256, 258 (1976). Thus, we find no error relating to mitigation of plaintiffs' damages.

Defendant's challenge proceeds with an attack upon the compensatory award to plaintiff Nelson. He argues that the trial court erred by awarding full damages for loss of business at Nelson's gourmet shop despite the evidence that other causal factors may have been involved and despite the sensitive nature of the enterprise. These arguments lack relevance, however, because the lower court did not award damages to plaintiff Nelson based on loss of business; instead, the court recognized the difficulties inherent in such an assessment and awarded damages based on lost rental value. This approach minimized the influence of factors other than the existence of the pig farm, and no error appears.

The final question presented regarding the trial court's computation of compensatory damages is whether the trial court "double-counted" in assessing damages to plaintiffs Nelson and Flory. Defendant contends that plaintiffs' awards of $15,500 and $15,300, respectively, for "lost use or rental income" and the awards of $50,000 and $60,000, respectively, for "deprivation of the full use and enjoyment of the property and emotional upset,

annoyance and discomfort" are duplicative and, therefore, erroneous. In making this argument, defendant ignores the trial court's conscientious explanation of each element of the award, and he confuses compensation for proprietary losses with compensation for personal losses. Where an abatable nuisance is found to exist, the award of damages can properly include both compensation for the lost use of property (calculated on the basis of diminished rental or use value) and compensation for personal injuries such as annoyance, discomfort, and inconvenience. *Wilson* v. *Key Tronic Corp.*, 40 Wash. App. 802, 811, 701 P.2d 518, 525 (1985); see also *Rust* v. *Guinn*, 429 N.E.2d 299, 302-04 (Ind. App. 1981); and Prosser, *supra*, § 90, at 602-03. The situation here was complicated because plaintiffs Nelson and Flory used their properties both as residences and as business locations. The court's findings distinguished carefully between their proprietary damages and personal damages. In essence, the trial court ordered full compensatory damages for all plaintiffs as residents and then awarded specific, additional amounts to plaintiffs Nelson and Flory as compensation for their business losses. Thus, the compensatory damage awards here do not include duplicative elements, and they are proper in all other respects as well.[4]

## C.

In addition to assessing compensatory damages, the trial court awarded plaintiffs a total of $380,000 in punitive damages. Defendants assert that punitive damages are unwarranted here; arguing that the evidence does not support a finding of actual malice.

In order to recover punitive damages, a plaintiff must demonstrate actual malice on the part of the defendant. *Shortle* v. *Central Vermont Public Service Corp.*, 137 Vt. 32, 33, 399 A.2d 517, 518 (1979). But no direct evidence of the defendant's mental state is required; instead, the nature of his conduct and the surrounding circumstances can establish his motive and his state of mind. *Dahlen* v. *Landis*, 314 N.W.2d 63, 69 (N.D. 1981). Thus, a showing of "conduct manifesting personal ill will or carried out under circumstances evidencing insult or oppression, or . . . a

---

[4] Raymond Ramsey also suggests that the magnitude of the compensatory awards indicates that the trial court enhanced them on grounds of malice, but he provides no support for his claim.

reckless or wanton disregard of one's rights" will suffice. *Shortle*, 137 Vt. at 33, 399 A.2d at 518 (citation omitted).

The trial court here found that "[d]efendants allowed the farm to operate as it did for the express purpose of upsetting, harassing and disturbing plaintiffs. The defendants intentionally disregarded the rights of plaintiffs under circumstances manifesting extreme ill will and insult." Defendants impugn this and other findings of malice, but the record is replete with evidence supporting the trial court's determination with respect to Normand Ramsey. A complete reiteration of the evidence is not required, but we note the following circumstances: the timing of the establishment of the piggery, the importation of many junked automobiles, the positioning of these vehicles and all other aspects of the operation near plaintiffs' properties, the dumping of two hundred cubic yards of wet chicken manure directly across from plaintiffs' properties, the threatening telephone calls, and the gross mistreatment and neglect of the farm animals. We also observe the absence of any other motive, commercial or otherwise, for maintaining the operation at issue.

On the other hand, the evidence elicited at trial does not support the court's finding of actual malice with respect to Raymond Ramsey. In sum, the record reveals that Raymond sought permits for the proposed motel, obtained permits for the farm, helped erect the fence around the farm, and directed the dumping of the first load of manure. Although this degree of participation in the nuisance was sufficient to create tort liability in Raymond, it did not rise to such a level that actual malice on his part could be inferred. The court's findings on the malice issue, often referring to defendants in the plural, are therefore clearly erroneous to the extent that they implicate Raymond Ramsey. It follows that Raymond cannot be held liable for punitive damages, and the trial court's judgment on this matter is reversed.

■ Because of Vermont's adherence to the doctrine of joint and several liability, our disposition of the punitive damages issue raises other questions. Where joint tortfeasors are involved, the traditional rule is that punitive damages are to be assessed "according to the guilt of the most innocent of the defendants; and, if any of them was acting in good faith and so not liable for such damages, none can be awarded in the suit." *Parker* v. *Roberts*, 99 Vt. 219, 225, 131 A. 21, 24 (1925). In theory, this rule would protect a relatively innocent defendant, otherwise liable only for

compensatory damages, from enhanced liability on the ground of another defendant's malice.

Many states have rejected the rigid application of the doctrine of joint and several liability in the context of punitive damages because of the problems it entails. Instead, these jurisdictions have adopted the rule that such damages may be apportioned among joint tortfeasors either by assessing the awards in varying amounts or by levying punitive damages against some defendants but not others. See *Shields* v. *Martin,* 109 Idaho 132, 138, 706 P.2d 21, 27 (1985); *Embrey* v. *Holly,* 293 Md. 128, 134, 442 A.2d 966, 973 (1982), and cases cited therein. This approach also maximizes effectiveness and fairness because each award can be calibrated to reflect the particular defendant's culpability and financial resources. *Embrey,* 293 Md. at 134, 442 A.2d at 973. We agree with the reasoning of these courts and hold that joint and several liability does not attach in the context of punitive damages; the traditional rule, as enunciated in *Parker,* is therefore abandoned. Here, because the trial court assessed punitive damages with reference to Raymond Ramsey, remand is necessary for reconsideration of the awards in light of Normand Ramsey's culpability and financial status.

### D.

■ Normand Ramsey argues that the court's assessment of punitive damages is excessive under the case law of this and other jurisdictions, and he urges that the awards contravene the protections of the state and federal constitutions against excessive fines. Although we are remanding the cause for reconsideration of these awards, discussion of the issues raised will provide valuable guidance to the trial court.

Because of the nature of punitive damages, no standard for precise measurement is available, and their assessment is largely discretionary with the finder of fact. See *Greenmoss Builders, Inc.* v. *Dun & Bradstreet, Inc.,* 143 Vt. 66, 77, 461 A.2d 414, 419 (1983). On review, such an assessment will not be interfered with unless it is " 'manifestly and grossly excessive.' " *Id.* (quoting *Gray* v. *Janicki,* 118 Vt. 49, 52, 99 A.2d 707, 709 (1953)); see also *Woodhouse* v. *Woodhouse,* 99 Vt. 91, 160, 130 A. 758, 790 (1925). Even where "the verdict may be considerably more or less than, in the judgment of the court, it ought to have been, still it will decline to

interfere unless the amount is so great or small as to indicate that it is the result of perverted judgment, accident, or gross mistake." *Woodhouse*, 99 Vt. at 157, 130 A. at 789.

We are not persuaded that the awards at issue are manifestly and grossly excessive. Punitive damages are not awarded in an attempt to compensate the plaintiff, but "on account of the bad spirit and wrong intention of the [defendant.]" *Glidden* v. *Skinner*, 142 Vt. 644, 648, 458 A.2d 1142, 1144 (1983) (citations omitted). " 'The purpose of punitive damages . . . is to punish conduct which is morally culpable . . . [and] to deter a wrongdoer . . . from repetitions of the same or similar actions. . . . The public benefit and a display of ethical indignation are among the ends of the policy to grant punitive damages.' " *Hilder* v. *St. Peter*, 144 Vt. at 164, 478 A.2d at 210-11 (quoting *Davis* v. *Williams*, 92 Misc. 2d 1051, 1054, 402 N.Y.S.2d 92, 94 (N.Y. Civ. Ct. 1977)).

In the course of assessing punitive damages, the finder of fact must take into account the character and standing of the defendant, the malice or wantonness of the defendant's conduct, and the financial status of the defendant. See *Woodhouse*, 99 Vt. at 155, 130 A. at 788. Here the weightiest factor in the punitive damages assessment was the degree of malice involved. Short of physical violence, it is difficult to imagine a situation entailing greater animosity and malevolence than that exhibited here, and the punitive damages award, as made, is an appropriate reflection of the "bad spirit and wrong intention" of defendants.

The other *Woodhouse* factors also provide support for the award. Defendants include a family corporation and its president. Normand Ramsey is a successful entrepreneur who maintains a small empire of motels, farms, a nursing home, and an automobile supply store, and whose net worth is in excess of three million dollars.

Defendant looks to case law from this and other jurisdictions in an attempt to demonstrate that the assessment of punitive damages here was excessive. Although such comparisons are of dubious value, we note two analogous cases in which punitive damage awards of similar proportions were affirmed. *Miller* v. *Carnation Co.*, 564 P.2d 127 (Colo. App. 1977), involved a poultry ranch that was declared a nuisance because of infestations of flies and rodents resulting from inadequate manure removal. A punitive damage award to a single neighbor of $300,000, which was assessed in addition to $85,748 in compensatory damages, was af-

firmed on appeal. Likewise, in *Bower* v. *Hog Builders, Inc.*, 461 S.W.2d 784 (Mo. 1970), a hog farming operation was found to have been a continuous nuisance over a period of four years. The farm had been designed with manure lagoons that would overflow periodically, sending excess excrement across neighbors' lands and into their surface waters. This condition, as well as odors and fly infestations, continued despite complaints from the plaintiff neighbors. The jury awarded one plaintiff $34,200 in actual damages and $60,000 in punitive damages and a second plaintiff $12,000 in actual damages and $30,000 in punitive damages. These awards were upheld against a claim of excessiveness. *Id.* at 805-06.

Given the effects of inflation, the awards challenged here do not differ appreciably in magnitude from those affirmed in *Miller* and in *Bower*. Furthermore, critical distinctions can be drawn because both *Miller* and *Bower* involved legitimate and profitable animal husbandry operations and because neither included allegations of actual malice. *Id.* at 798-99; *Miller*, 564 P.2d at 131. In contrast, the record here supports a conclusion that the piggery was established and maintained solely for spiteful purposes.

Normand Ramsey asks this Court to gauge the award against a different standard, however, invoking Chapter II, § 39 of the Vermont Constitution and the Eighth Amendment of the United States Constitution. Section 39 relates to criminal prosecutions and indictments and provides that "all fines shall be proportioned to the offences." Vt. Const. chap. II, § 39. The Eighth Amendment also prohibits excessive fines. U.S. Const. amend. VIII. But the terms of these constitutional provisions, as well as their context, limit their applicability to criminal punishments. This Court has distinguished between the imposition of a fine in a criminal proceeding and the award of punitive damages in a civil action. *Hoadley* v. *Watson*, 45 Vt. 289, 292 (1873). On the other hand, the United States Supreme Court has noted that "[s]ome punishments, though not labeled 'criminal' by the State, may be sufficiently analogous to criminal punishments in the circumstances in which they are administered to justify application of the Eighth Amendment." *Ingraham* v. *Wright*, 430 U.S. 651, 669 n.37 (1977). Here, we observe only that, even if these constitutional provisions have some application, the punitive damages as assessed would not violate their protections.

## E.

Defendant Normand Ramsey concludes by questioning the standing of the Florys to sue in the name of their business because they failed to register the name of their motel pursuant to the requirements of 11 V.S.A. § 1621, and were, therefore, not entitled to maintain this action. We do not resolve the issue; it constitutes an affirmative defense which was not raised specifically and in a timely manner. *Senesac v. Duclos*, 128 Vt. 601, 603, 270 A.2d 156, 158 (1970); V.R.C.P. 12.

*Affirmed in part and reversed in part; the cause is remanded for reconsideration of the punitive damages awards.*