**STATE OF VERMONT**

**ENVIRONMENTAL COURT**

| | |
|---|---|
| Secretary, Vermont Agency of Natural Resources, | Docket No. 102-5-02 Vtec |
| v. | |
| Don Weston, Respondent. | |

Decision and Order

On April 29, 2002, the Secretary of the Vermont Agency of Natural Resources (ANR) issued an administrative order pursuant to 10 V.S.A. ' 8008 regarding Respondent, which was served on Respondent May 7, 2002. Respondent timely requested a hearing in Environmental Court, which was held by agreement of the parties in July, 2002. Respondent is represented by Michael G. Furlong, Esq.; and the Secretary of the Agency of Natural Resources is represented by Catherine Gjessing, Esq.

The statutes, rules and permits applicable to this matter are 4 V.S.A. Chapter 27; 10 V.S.A. Chapter 151 (Act 250) and Land Use Permit 4C0635-3R-1, Condition 17; ; 10 V.S.A. Chapter 159 and Solid Waste Management Rules ' 6-302 and 10 V.S.A. Chapter 201. 10 V.S.A. ' 8012(c)(2).

Findings

Respondent owns approximately 146 acres of land located off Plains Road in Jericho, including land designated as a 33-acre Agricultural portion of Parcel 5A (the Agricultural Area) in a subdivision subject to Act 250 Permit 4C0635-3R-1 (the Permit). The 33-acre Agricultural Area is subject to Condition 17 of the Permit, requiring it to be maintained as A open, cleared, uncluttered and unencumbered land.@ Condition 17 prohibits activities, such as the construction of buildings, which would reduce the potential of the soils for agricultural use. However, it does not specifically require the Agricultural area to be put into productive farming use at any specific time, despite its label as agricultural. Rather, it requires the owner or lessee, at a minimum, to A cut hay from the Agricultural area twice each year@ and to A fertilize this area at least once every three years.@ The property was already subject to this permit condition when Respondent purchased it in 1989. Respondent has maintained the Agricultural Area as open, cleared, uncluttered and unencumbered land, and has not constructed anything on it that would reduce the potential of its soils for agricultural use.

Four approximately 3-acre residential lots lie between the Agricultural Area and Plains Road. Access to the Agricultural Area from Plains Road lies along a farm road or right-of-way running along the southerly boundary of one of the residential lots. Some of the owners of the residential lots had successfully opposed an application Respondent had filed to further develop the property.

Respondent does not farm the Agricultural Area himself. Respondent has a contracting and earthmoving business, operated from an office in Williston. Respondent uses hay in his business as mulch or in bale form for erosion control on construction projects.

During 1989 and the 1990s, Respondent had leased the Agricultural Area to farmers who used the field for hay or occasionally to plant corn. These farmers cut the hay and harvested the corn, and may have applied fertilizer when the field was planted to corn. From the time of his purchase

of the property in 1989 to 1999, Respondent made no arrangements himself to bring manure or any other fertilizer to the Agricultural Area, and did not inform the farmers of the requirement to fertilize at least every three years or to cut hay twice each year. Respondent did not seek a minor permit amendment to change either the requirement that he fertilize at least every three years or to change the requirement that he cut hay twice each year. Respondent did not cut hay or arrange to have hay cut from the Agricultural Area in 2000 or 2001.

At some time during the year 2000, the farmer who had been using the field had decided not to continue to farm the Agricultural Area, but did not immediately inform Respondent of that fact. Long before becoming aware of the farmer= s decision not to continue using the field, Respondent brought approximately 75 cubic yards of chicken manure to the property in late May or early July 2000, and placed it in a large pile approximately located in the Agricultural Area near the rear boundary of the residential lots.

Two to three months later, the Town health officer and a Department of Agriculture inspector visited the field on August 30, 2000, in response to odor complaints from the neighbors, and the Town health officer informed Respondent at that time of the complaints. They found the odor to be strong but did not at that time require any action, as the material appeared to be chicken manure. On November 27, 2000, two Department of Agriculture inspectors visited the field in response to additional odor complaints, and then informed Respondent at his Williston office that he would need to grow and harvest a crop, and to spread manure at an agronomic rate, in order to be considered an agricultural operation, and that if he did not do so, the pile of chicken manure could be considered to be a solid waste violation. They advised him that he would have to spread the chicken manure material before the December 15 - April 1 ban on manure spreading as an agricultural practice. They suggested that he could cut a crop of hay suitable for construction mulch to use in his business, even if the quality of the grass was not sufficient to cut hay for animal feed.

On December 14, 2000, one of the Department of Agriculture inspectors checked the property and determined that the pile had not been spread. On December 19, 2000, the Commissioner of Agriculture wrote to Respondent stating that the Department had understood that he would spread the pile before December 15, 2000, and that for the Department to continue to classify the operation as agriculture, he would need to spread the pile in April of 2001 and to harvest agricultural products from the land. The letter warned Respondent that if the required practices were not carried out the Department would refer the matter of the > chicken waste pile= to the Agency of Natural Resources for investigation as a solid waste violation.

The farmer who had farmed the Agricultural Area in prior years informed Respondent that he would not be continuing and would not be able to spread the pile. In late November or early December 2000 Respondent made arrangements with an experienced farmer to spread the chicken manure pile before the ban went into effect, and to use the Agricultural Area for farming in the following year. He informed the Commissioner of Agriculture that the farmer he had located to spread the material > would like to plant corn in the spring= of 2001.

Respondent testified that he had brought the material to the property for the purpose of incorporating it into the soil for soil enrichment. However, the Court does not find that testimony to be credible as to his intent before November 27, 2000, because the manure was not used for soil enrichment during the growing season of the year 2000, because no growing crops prevented its being spread earlier in the year 2000, and because there was no evidence that Respondent was engaging in a practice of composting the material.

The material placed on the property in the early summer of the year 2000 was spread on top of the ground late on December 14, 2000, on the last day on which manure is allowed to be spread under the Department of Agriculture rules for Acceptable Agricultural Practices. It was neither

plowed into the field nor otherwise used for soil enrichment until a crop was planted on the field in the summer of 2002.

The amount of material brought to the property in 2000 would not have been excessive for the purposes of soil enrichment of a field the size of the Agricultural Area if it had been spread. In fact, that amount of manure was too little material for the proper soil enrichment of this size field, by a factor of three to four. That is, three to four times this amount of manure would have been necessary for soil enrichment to grow a crop on this size of farm field.

The stacking of manure in a field to be spread at a later date may be an acceptable agricultural practice if the manure is stacked for the purpose of incorporating it into the soil for soil enrichment when conditions allow. That is, during a period when manure cannot be spread because the field is frozen or is in use for a growing crop, or in order properly to compost the manure, manure may be stacked on a level surface until it can be spread, without violating the Acceptable Agricultural Practices.

Respondent informed the farmer who had spread the material in December of 2000 that he should farm the Agricultural Area in 2001, and that Respondent would buy any hay produced by the field for use as construction mulch, but Respondent did not ask or require him to cut hay in 2001. In 2001 no hay or other crop was grown or cut on the Agricultural Area. Part of it had horses grazing on it in that year.

Respondent brought one or two new loads of material to the property in midsummer of 2001, and placed them close to the rear property line of the residential lots. The material consisted largely of chicken manure but also included feathers, eggshells, and parts of dead chickens. When first brought to the property, and in the heat of midsummer, the material produced an extremely foul odor resembling that of rotting carcasses more than that of manure from chickens or other animals. The witnesses who testified about the odor were familiar with farm and manure odors and their distinction from the odor of rotting carcasses, and also saw chicken parts pulled from the pile by a dog. Thousands of flies were attracted to or bred within the material, and infested the neighborhood to the point that the nearby residents could not make use of their outdoor space for normal summer residential uses or for one resident= s daycare business. Respondent came to the property with a bucket loader from time to time in the summer and turned the material in the pile, releasing more of the odor. He brought the material to the property or turned it on Fridays, in particular before holiday weekends.

In response to an inquiry from an Agency of Natural Resources inspector on August 28, 2001, Respondent informed him that he intended to bring in an additional load, that it would be spread on the field in about two weeks, and that the farmer would be growing a crop on the field in 2002. By September 4, 2001, Respondent had brought in approximately one more load, for a total of approximately 45 cubic yards, and had turned the piles. As of September 18, 2001, the material had not been spread on the field, and on September 19, 2001, the Agency of Natural Resources issued Respondent a Notice of Alleged Violation for storage of solid waste without a permit, as the material was not being used for agricultural purposes. The Notice directed him not to bring any additional solid waste to this location without obtaining a solid waste permit, and directed him either to spread the material by September 28, 2001 or to remove it from the site.

As of September 28, 2001, a Friday, and also as of October 1, 2001, the following Monday, Respondent had not spread the material. Respondent had the material spread and harrowed into the soil on October 5, 2001.

By the summer of 2002, the quality of the property was such that it would require seeding as well as fertilizing to grow an adequate crop of hay for use by animals. In the summer of 2002, Mr. Davis planted corn on the Agricultural Area.

The property yields 3,500 to 4,000 bales of hay when cut. The cost of having the field cut and baled would be approximately one to one-and-a-half dollars per bale. Accordingly, using the lower estimate as the weather was uncooperative and the field would not have been particularly productive in 2000 and 2001, the cost Respondent avoided by not having the Agricultural Area hayed was $3,500 for each cutting.

The cost of loading and transporting the manure was $40 per hour. Assuming that the manure was transported from a location within one hour=s drive from the site, and that it took some time to load and unload, we will allocate two hours worth of cost to the cost of removal of each load of manure. A tandem trailer load has a volume of 15 cubic yards. The avoided cost of removal of the 75 cubic yards from 2000 and the 45 cubic yards from 2001 can therefore be calculated as eight loads x two hours/load x $40/hour, or $640.

Conclusions as to Violation (10 V.S.A. ' 8012(c)(1)):

The statute requires this Court to determine whether a violation has occurred, 10 V.S.A. ' 8012(b)(1), independently of reviewing and determining anew a penalty amount. 10 V.S.A. ' 8012(b)(4).

First, by failing either to seek a minor permit amendment or to cut hay at all from the Agricultural Area in the years 2000 or 2001, Respondent violated Condition 17 of Act 250 Permit No. 4C0635-3R-1 and thereby violated Act 250.

In the years 2000 and 2001, by stockpiling material consisting of chicken manure alone or mixed with other non-exempt materials such as chicken carcase parts, and by failing actually to use the chicken manure component of the material for soil enrichment or to seek approval of its stockpiling as an > insignificant waste management event= under Vermont Solid Waste Management Rule 6-302, Respondent violated ' ' 6-302 of the Solid Waste Management Rules by storing solid waste outside a certified facility.

10 V.S.A. ' 6602(2) and Vermont Solid Waste Management Rule ' 6-201 exempt from the definition of solid waste Aanimal manure and absorbent bedding used for soil enrichment.@ This exemption depends on the actual use of the manure and not on the landowner=s intent. Even if Respondent had intended in the year 2000 for the chicken manure component of the material to be used for soil enrichment, it was not in fact used for that purpose. It was not spread until December 14 in the year 2000, so that the material piled in the year 2000 was not used for soil enrichment until the year 2001. If Respondent had intended in the year 2001 for the chicken manure component of the material brought to the property that year to be used for soil enrichment, it was not in fact used for that purpose until October 5, 2001.

The fact that stockpiling of manure may be considered an acceptable agricultural practice under some circumstances assists farmers to comply with the Non-Point Source Pollution Reduction Program administered by the Department of Agriculture under a memorandum of agreement with the Agency of Natural Resources, and may assist farmers to show that they qualify for protection from liability for nuisance under the so-called right-to-farm law[1]. It cannot not provide an exemption from a specific condition in an Act 250 permit, nor does it alter the requirement in the exclusion from the definition of solid waste that the exclusion only applies to animal manure and absorbent bedding which is actually used for soil enrichment.

In this regard, we must note that the neighbors may also have a private nuisance cause of action against Respondent, regardless of whether he violated any permit or state regulation, if the purpose or effect of the stockpiled manure was to adversely affect their enjoyment of their own property. However, the state=s environmental enforcement mechanisms are ill-equipped to protect such private rights, compared with a private nuisance suit brought by those aggrieved by

the activity. That is, if a landowner brings excessive amounts of manure to a property or places it for the purpose of preventing the neighbors from being able to enjoy their property, it may support a private nuisance action, regardless of whether it is a violation of the solid waste rules or of another state permit. See, e.g., Coty v. Ramsey Assoc., 149 Vt. 451 (1988).

Determination of Order and Penalty (10 V.S.A. ' 8012(c)(3)):

The Administrative Order contains a penalty and a directive for future compliance, but no remedial provisions. 10 V.S.A. ' 8012(b)(2). Therefore, the Court must both review and determine anew an appropriate penalty amount for the violations by applying the eight criteria set forth in 10 V.S.A. ' 8010(b) (10 V.S.A. ' 8012(b)(4)), and must determine whether to affirm, modify or reverse the order for future compliance. 10 V.S.A. ' 8012(b)(3).

Paragraph D of the Administrative Order, requiring future compliance with the conditions of Respondent= s Act 250 Permit, and any subsequent permit, is hereby affirmed; it is simply a statement of the law.

Paragraph C of the Administrative Order, however, must be modified. Respondent cannot be prohibited from transporting manure of a specific type to the property, primarily because the definition of solid waste excludes animal manure and absorbent bedding used for soil enrichment, thereby putting it beyond the scope of the Agency to regulate. However, Respondent can and should be held strictly to those limitations, and specifically should be prohibited from disposing of any chicken (or other animal) waste on the property other than chicken (or other animal) manure and absorbent bedding. Waste feathers, eggs, eggshells, and chicken carcases, body parts, entrails or waste meat specifically do not fall within the exclusion and are not authorized even if they are mixed with the animal manure, other than incidental feathers that might be mixed with absorbent bedding or manure.

The Secretary seeks a penalty of $14,500 in total for these two violations, measured by the avoided cost of haying the field twice in 2000 and twice in 2001, plus the cost of bringing the manure to the property.

First we must note that for a civil penalty to withstand constitutional scrutiny, it must be basically remedial in effect, rather than punitive. The methodology inherent in the statute and applied by this Court is to remove the economic benefit gained from the violation, in order to carry out the statutory purpose of preventing the unfair economic advantage obtained by persons who operate in violation of environmental laws, 10 V.S.A. ' 8001(2) and ' 8010(b)(5), and then to apply the remaining statutory factors to determine what additional penalty is needed, or whether mitigating factors should reduce any element of the penalty. That is, the entire economic benefit first must be removed to carry out a primary purpose of the Uniform Environmental Enforcement Act: to make it less expensive to comply with the law than to violate it.

The Act 250 violation is relatively straightforward. The baseline penalty is measured by the economic benefit of $14,000, based on Respondent= s having avoided the cost of haying the field twice a year for two years. No actual environmental harm has resulted from the failure to hay or cut the field, as its agricultural potential has not been damaged, it can be renovated and improved with seeding and fertilization, and it has been planted to corn in the present season. ' 8010(b)(1). No mitigating or aggravating circumstances were shown. The fact that the inspectors in 2000 and 2001 focused on the possible solid waste violation does not relieve Respondent of the responsibility for complying with the Act 250 Permit= s requirements or seeking an amendment of the Act 250 permit. ' 8010(b)(3). Respondent knew or should have known the terms of the Act 250 Permit. ' 8010(b)(2). Respondent had no prior record of non-compliance with Act 250. ' 8010(b)(4). The Secretary does not seek actual costs of enforcement in the present case. '

8010(b)(7). The violation occurred during two seasons, but as it is a seasonal type of violation the two year duration is not lengthy under the circumstances.

Taking these factors into account, the removal of the economic benefit will have a sufficiently deterrent effect so that no additional penalty above the removal of the economic benefit is necessary to achieve deterrence of future violations. ' 8010(b)(6).

The solid waste violation is more difficult to assess. The economic benefit baseline penalty is much more difficult to measure, as Respondent would have been entitled to bring far more manure to the property than he did bring, if he had either spread it and incorporated it into the soil in the spring of the year as may have been required for the improvement of the soil, or if he had had a reason to store it and had stored it at a location on the property and in a manner that demonstrated that it would be used for soil improvement. Respondent achieved no economic benefit by the solid waste violation, other than the avoided cost of removal of the material amounting to $640.

The mixing of chicken parts or other carcase waste into the material presented a potential for harm to human health and actual harm to the welfare of the neighboring residents, who were prevented by the odor and the flies from the outdoor use of their property during some portions of the summers of 2000 and 2001. ' 8010(b)(1).

No mitigating or aggravating circumstances were shown, other than Respondent= s possible motivation for the violation vis-à-vis his neighbors, which cannot be fully vindicated through the Uniform Environmental Enforcement Act as compared with a nuisance lawsuit. The fact that the inspectors in 2000 focused on the question of whether the handling of the material had a legitimate agricultural purpose, and only warned Respondent of a possible solid waste violation as of December of 2000 suggests that the duration of the violation in 2000 should not be given as much weight as the duration of the violation in 2001, after Respondent knew of the solid waste issue. ' 8010(b)(2) and (3). Respondent has no prior record of non-compliance. ' 8010(b)(4). The Secretary does not seek actual costs of enforcement in the present case. ' 8010(b)(7). The duration of the solid waste violation was approximately seven months in 2000, but only two weeks from the inspectors= November 27, 2000 warning that the material had to be spread by December 14, 2000. ' 8010(b)(8). The duration of the solid waste violation was approximately two months in 2001, but again only two weeks from the Notice of Alleged Violation on September 19, 2001 to the spreading and harrowing of the material on October 5, 2001. However, by 2001 Respondent was well aware that the failure to use animal manure for soil improvement would subject him to the solid waste regulations, making the violation as or more serious than in the previous year, although of shorter duration. An additional penalty component would be necessary to achieve deterrence of future violations, except that the penalty for the Act 250 violation is sufficiently large to achieve this result for both violations. ' 8010(b)(6).

Accordingly, taking all these factors into account, the Court will impose a penalty of $14,640 for the two violations.

Based on the findings, conclusions, and reasoning of this decision, it is hereby ORDERED that:

1. Paragraph A of the April 29, 2002 Administrative Order is vacated. On or before November 1, 2002, Respondent shall pay a penalty of $14,640 to the State of Vermont, to be deposited in the general fund pursuant to 10 V.S.A. ' 8010(e).

2. Paragraph C of the April 29, 2002 Administrative Order is modified as follows:

Respondent shall not spread, store or dispose of chicken waste or any other animal waste on the property, other than chicken or other animal manure and absorbent bedding used for soil

enrichment. Respondent shall conform to Accepted Agricultural Practices as published by the Department of Agriculture when using animal manure and absorbent bedding to fertilize or enrich the soil.

3. Paragraph D of the April 29, 2002 Administrative Order is affirmed.

Rights of Appeal (10 V.S.A. ' 8012(c)(4) and (5)):

WARNING: this decision will become final if no appeal is requested within 10 days of receipt of this decision. Respondent and the Secretary of the Agency of Natural Resources have a right to appeal this decision. The procedures for requesting an appeal are found in the Vermont Rules of Appellate Procedure (V.R.A.P.) subject to the exceptions in Vermont Rules of Civil Procedure (V.R.C.P.) 76(a)(3) and (d)(5). Within 10 days of receipt of this Order, any party seeking to file an appeal must file the notice of appeal with the Clerk of this Court, together with the applicable filing fee. Questions may be addressed to the Clerk of the Vermont Supreme Court, 111 State Street, Montpelier, VT 05609-0801, (802) 828-3276. An appeal to the Supreme Court operates as a stay of payment of a penalty, but does not stay any other aspect of an order issued by this Court. 10 V.S.A. ' 8013(d). A party may petition the Supreme Court for a stay under the provisions of V.R.C.P. 62 and V.R.A.P. 8.

Done at Barre, Vermont, this 25th day of September, 2002.

_____
Merideth Wright
Environmental Judge

---

**Footnotes**

[1.] 12 V.S.A. 5753:(a) Agricultural activities conducted on farmland, if consistent with good agricultural practices and established prior to surrounding non_agricultural activities, shall be entitled to a rebuttable presumption that the activity does not constitute a nuisance. If an agricultural activity is conducted in conformity with federal, state, and local laws and regulations, it is presumed to be good agricultural practice not adversely affecting the public health and safety. The presumption may be rebutted by a showing that the activity has a substantial adverse effect on the public health and safety.

(b) Nothing in this section shall be construed to limit the authority of state or local boards of health to abate nuisances affecting the public health, as provided in 18 V.S.A. chapter 11.