Vermont Teddy Bear v. Gawrys, No. S1392-01 (Katz, J., Apr. 15, 2004)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
Chittenden County, ss.:


VERMONT TEDDY BEAR CORP.

v.

GAWRYS


ENTRY

Defendant Gawrys was an employee of the Vermont Teddy Bear Corporation where he helped develop new systems to improve shipping. In 1999 Gawrys was terminated. To assert control over the systems Gawrys had helped developed, the company filed for declaratory relief for its patent rights. In response, Gawrys counter-claimed for stock options that he claimed were wrongfully denied. As part of his relief, Gawrys also asked for punitive damages. Following some initial discovery, the company has filed for summary judgment on the issue of punitive damages.

The purpose of punitive damages is to punish morally culpable behavior and deter the perpetrator and others from repeating such mistakes. Coty v. Ramsey Assocs., 149 Vt. 451, 467 (1988) (quoting Davis v. Williams, 402 N.Y.S.2d 92, 94 (Civ. Ct. 1977)).  By invoking moral culpability, punitive damages depend in part on the defendant's mental state.  D.Dobbs, Remedies § 3.9, at 205 (1973).  But by the same token, the actions involved must be extreme and invoke the type of outrage that is consistent with criminal activity.  Brueckner v. Norwich Univ., 169 Vt. 118, 129 (1999) (quoting W. Keeton, et al., Prosser and Keeton on the Law of Torts § 2, at 9 (5th ed. 1984)).  Thus the test for punitive damages requires outrageous acts and evidence of intentional and deliberate wrongdoing.  Id.

Gawrys urges punitive damages for his claims of conversion, implied contract, unjust enrichment, and constructive trust based on incidents surrounding his termination.  Gawrys argues that these facts are so intertwined with his claims that they must be considered.  To support this argument, Gawrys cites to Crump v. P & C Food Markets, Inc., 154 Vt. 284, 296 (1990).  In that decision, the Vermont Supreme Court mentioned that the manner of termination if oppressive and abusive could provide grounds for the tort action and punitive damages.  Id.  The underlying tort in that case was intentional infliction of emotional distress.  Gawrys does not allege a similar tort.  Instead, his claims are premised on the wrongful withholding of his stock options.  Setting aside the lack of an underlying tort for the moment, Gawrys' theory is essentially that the company's withholding of his stock options was part of a larger, sinister series of actions that were intentional, vindictive, and malicious.  That is, the other incidents surrounding his firing work together to form a pattern of outrageous activities that should be punished to discourage the company or

any other company from behaving in a similar manner towards employees. Such a charge requires that we examine the underlying incidents to see if they so cohere.

Gawrys bases his claim for punitive damages on roughly eight incidents by the company including:

1) Arranging to have Shelburne police present when he was terminated with a notice of trespass;

2) Having police watch the plant for 60 hours following his termination;

3) Terminating him when he expected to receive a raise;

4) Having Spencer Putnam, a vice-president of the company, escort him off the grounds following his termination;

5) Refusing to allow him to collect his personal belongings following his termination;

6) Not offering him COBRA insurance benefits;

7) Disputing his unemployment claim; and

8) Allowing company founder Elisabeth Robert to talk with employees before their depositions.

Assuming for the purposes of summary judgment that these allegations are true, Fritzeen v. Trudell Consulting Eng'rs, Inc., 170 Vt. 632, 633 (2000) (mem.), the question is whether or not they amount to malice. The first two incidents involving the Shelburne police were done because the company feared retaliation or a violent outburst from Gawrys following his termination. The two officers present at the company when he was fired did not escort him from the building and took no actions against Gawrys. To his credit, Gawrys was peaceable when he learned of his termination and has since not attempted or demonstrated any intent to harm the company. In retrospect, the police involvement may have been

unnecessary. But that does not make it malicious. The company had every right to call the police and ask for post-termination surveillance of the factory. Doing so does not necessarily demonstrate an animus toward Gawrys. Furthermore, the notice of trespass served by the police is a mere predicate to any later charge of trespassing. See 13 V.S.A. § 3705(a)(1); Maarawi v. Parenteau, No. 2001-230 (Vt. Dec. 2001) (unpublished mem.). Since Gawrys was no longer an employee, his continued presence or re-entry onto the company property could be called trespassing. Since Gawrys has honored the notice and not returned to the company's property, this action has not affected him.

As for his termination, Gawrys does not allege that the company offered him a raise or lured him into the meeting with any kind of promises. His belief that was eligible for a raise appears to come from his own perception. Therefore, the company did not breach any promise when they fired him. Looking at the submitted evaluation reports does allow the inference that Gawrys may have been a good employee and that the company was pleased with parts of his performance, but the nature of at-will employment is that a company may terminate its relationship with an employee at any time for any reason, good, bad, or otherwise. Dulude v. Fletcher Allen Health Care, 174 Vt. 74, 82 (2002). Terminating employment, however, does not in and of itself demonstrate malice. As for allowing him to collect his personal belongings, many companies do not allow employees to re-enter the workplace after termination. Reasons for doing so range from fears that employees will take company property to concerns that they will create a scene and disrupt the workplace. While the validity of this action may be questioned in hindsight, it is not in and of itself an offensive, illegal, or uncommon work practice.

Gawrys next two claims concern the company's efforts to limit his

post-employment benefits.  The first, refusing COBRA insurance benefits, was done because the company believed Gawrys committed gross negligence.  Gawrys claims this accusation was unsubstantiated, but he does not deny that the underlying accusation was made against him.  The question, however, is not what level of proof does a company need before they can rightfully deny COBRA, but rather did the company have a good faith reason or a malicious reason for making that denial.  The evidence is less than conclusive for malice since there was at least a facial reason for denying this benefit.  Gawrys offers no proof or reason to conclude that the claim was false or more importantly that the company knew it was false which might call into question their withholding.  Likewise, the company's dispute over unemployment benefits appears to have been informed by similar information.  Gawrys takes offense at the company's challenge to his benefits, especially the use of the facts surrounding his termination.  By mentioning the role of the police and the company's reasoning for calling them, Gawrys argues, the company crossed a line and maliciously attacked him in his unemployment hearing.  As his former employer, the company had a statutory right to challenge Gawrys' unemployment compensation. 21 V.S.A. § 1344; Strong v. Dep't of Emp. & Training, 144 Vt. 128, 130 (1984).  The fact that it presented evidence against Gawrys was also within its proper function.  See, e.g., Mazut v. Dep't of Emp. & Training, 151 Vt. 539, 541–42 (1989) (rejecting former employers challenge for lack of evidence).  Despite Gawrys' disagreement with some of the facts and the conclusions the company urged from them, he presents no evidence that they were irrelevant to the company's claim to the Department or that the company used false facts or used them while knowing them to be untrue.

That leaves only Gawrys' claim that Elisabeth Robert talked with employees prior to their depositions.  The fact that she had such a conversation with the witnesses may go to their credibility or their

reliability under V.R.E. 607, but short of any evidence of coercion or undue influence, there is little to go on.  Gawrys offers no evidence beyond the fact that Robert talked with the witnesses the morning of the deposition.  All of the witnesses described the conversation as innocuous and gave no evidence of being coerced or coaxed to remember anything outside of their personal experience.  While such a conversation may affect the witnesses' credibility to a fact finder, this incident does not strike us as outrageous or malicious.

Individually, these incidents do not appear outrageous or evince a malicious mental state.  Indeed, there is no apparent morally culpability in any of these acts, and they are on the whole, legal.  Together, they illustrate some disdain toward Gawrys but not any particular ill will.  The company's actions are also easily distinguishable from other incidents where punitive damages were found.  See, e.g., Denton v. Chittenden Bank, 163 Vt. 62, 63–66 (1994) (recounting employee's humiliation and suffering at the hands of an supervisor who hounded and harassed him at work, home, and at special occasions with probing, embarrassing questions); Crump, 154 Vt. at 288–89 (describing public accusations by supervisors and representatives of the company accusing employee of being a thief in front of his co-workers and noting that he was subjected to an intense three-hour, non-stop interrogation where his employer pressured him repeatedly to sign self-incriminating confessions and was summarily fired); Coty v. Ramsey Assoc. Inc., 149 Vt. 451, 453–57 (1988) (describing the extensive lengths owners went to in turning their Stowe property into an animal-carcass-covered, manure-ridden wasteland in retribution for neighbors opposing their development permit).

In contrast to Crump, Denton, and Coty, Gawrys has presented several incidents but none that shock, offend, or demonstrate a reckless

disregard of his rights.  <u>Schanabel v. Toyota, Inc.</u>, 168 Vt. 354, 362 (1998).
There is simply no evidence that the company acted as it did to maliciously
deprive Gawrys of his stock options and personal belongings.  Not every
step that the company took may have been necessary, but every step was
legal.  Individually or together, there is no act that is worthy of punishment.
Without such requisite wrongful conduct and malice, <u>Brueckner</u>, 169 Vt. at
129–30, there can be no punitive damages.

     Therefore, Vermont Teddy Bear Corporation's motion for summary
judgment is granted and the request for punitive damages is dismissed.

     Dated at Burlington, Vermont_____, 2004.

                                     _____

                                     Judge