Gavin v. Blouin, No. S 771-11-00 Wncv  (Teachout, J., Dec. 11, 2002)

[The text of this Vermont trial court opinion is unofficial.  It has been reformatted from the original.  The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

**STATE OF VERMONT**
**WASHINGTON COUNTY, SS.**

| | | |
|---|---|---|
| **BEVERLY GAVIN and** | ) | |
| **ROBERT GAVIN** | ) | |
| | ) | |
| **v.** | ) | **Washington Superior Court** |
| | ) | **Docket No. S 771-11-00 Wncv** |
| | ) | |
| **JOYCE BLOUIN and** | ) | |
| **ROGER BLOUIN** | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

        This matter came before the court for a hearing on the merits on October 8 and 10, 2002. Plaintiffs are represented by Gary D. McQuesten, Esq.  Defendants are represented by Andrea Gallitano, Esq.   A view of the property at issue was taken on October 10, 2002.  The parties own adjoining camp properties on Eligo Lake.  Defendants erected a fence on the boundary line between their properties.  Plaintiffs claim that it is an unnecessary "spite fence" and seek to enjoin continued maintenance of the fence in its current form.  Defendants claim that it is a legitimate privacy fence.

        Based on the evidence admitted and after consideration of the arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law.

**Findings of Fact**

Beverly Gavin and Joyce Blouin are sisters.  Beverly and her husband Robert Gavin live

in Graniteville, and Joyce and her husband Roger Blouin live in Barre. The two sisters, and the two couples, had a close relationship until the death of the sisters' father, Raymond Craige, who died in March of 1995. For many years prior to his death, Raymond Craige owned two adjoining camps on Eligo Lake. The two camp dwellings are close together, and the two properties were treated as a combined family compound. Both couples spent a lot of enjoyable family time together at the Craige properties at Eligo Lake.

For several years prior to Mr. Craige's death, the Gavins occupied the "front" camp, which had a newer camp building and is on a point with considerable lake frontage and the best view of the lake, while the Blouins occupied the "back" camp, which was older and smaller and behind the front camp. From the cottage on the back camp, the Blouins had an unobstructed view of the lake toward the side, where the lake frontage on that parcel is, plus a broader view of the lake looking across the front camp parcel from the front steps of the cottage. At that time the view across the front parcel was partially obstructed by the camp building itself and various trees along the shoreline on the point. All parties had a reasonable expectation that when Mr. Craige died, the Gavins would acquire the front camp and the Blouins would acquire the back camp under Mr. Craige's will, consistent with their usage. In accordance with their expectations, over the years each of the couples had made improvements to the camp they expected to acquire, such as adding a dock or deck.

When Mr. Craige died, Beverly Gavin was the Executrix of his estate. In addition to the real property in the estate, Mr. Craige left a checking account in the names of himself and Beverly Gavin as joint tenants with right of survivorship. The relationship between the sisters, and the two couples, broke down over two issues. First, Mr. Craige's will provided for the reverse of what the parties expected: it provided for the Gavins to have the *back* camp and the Blouins to have the *front* camp. The Gavins thus were not given the nicer, newer camp they expected. Beverly Gavin initially took the position that this was a clerical mistake. When the Blouins learned of the actual terms of the will, lawyers became involved, and the Probate Court ruled that the properties were to be decreed according to the will, and not according to expectations. Thus, the Gavins became owners of the back camp, and the Blouins became owners of the front camp. Secondly, Beverly Gavin did not initially include the value of the joint checking account in the inventory of the probate estate. As a result of a second ruling of the Probate Court, the checking account proceeds were accounted for in the probate estate, and were divided fractionally pursuant to an agreement between the two sisters and their third sister. These events resulted in bad feelings between the two couples, and they have not reconciled since, despite efforts by their adult children. Rude gestures have been exchanged between the parties.

After each couple took possession of the camp each acquired from Mr. Craige's estate, each made changes and improvements. The Gavins, who acquired the back camp, have made the

most extensive changes.  They invested over $30,000 and moved the location of the camp building slightly, added a foundation, raised the roof, closed in a screened porch, changed and enlarged the windows to provide a better view of the lake, and transformed the camp from a fishing cottage with limited views to a modernized dwelling they can (and do) use all year round, although it is still their secondary residence.  The Blouins also made changes to the front camp. They enlarged windows and moved their deck from the back side (facing the back camp) to the side where they have a better view of the lake from the deck.  The two camps had previously shared a single driveway.  After each couple took ownership of the exchanged camps, a fork in the single access road was created to make a second driveway so that each couple had separate access to their own camp.

During and after the troubles over the estate, the parties often found themselves in close proximity to each other while at camp because of the closeness and layout of the camp properties.  All parties found it uncomfortable to be in full view of the other, and felt that 'the other side' was watching them.  They had many friends in common, and the Blouins did not like the fact that when their friends came to call, the Gavins often conversed with the guests as they came and went, although such visitation was normal and reasonable given the layout of the camps and driveway and the many friendships they had in common.  The Gavins put up a fence to separate the two parcels along the common boundary, but it consisted of a single strand of chain strung on poles.  While it marked the boundary, it did not serve to create privacy benefitting the owners of either property.

After the Gavins had completed the renovations of their property, including the chain fence, and established regular use of the newly renovated camp, the Blouins constructed a new fence between the properties.  The fence is a double sided board fence erected by a commercial fencing company, finished on both sides.  The fence is constructed in a good and workmanlike manner.  The fence runs along the length of the common boundary that runs from the shore front to a corner in the boundary near the fork in the driveway.  It is 8 feet tall, and constructed of wood with alternating vertical boards spaced slightly apart from front to back, so that when viewed straight on, it blocks all view; when viewed obliquely, there is a filtered view such as through half-closed Venetian blinds or wooden shutters.

In addition to the fence, the Blouins planted cedar trees on their parcel at three locations. Some of the trees represent a potential future obstruction of the Gavins' view of Lake Eligo if the cedar trees grow tall, although currently many of them are not thriving.  They are planted (1) next to the fence where it meets the shoreline, (2) between the Blouins' new driveway and the Blouins' shorefront at a location not near the common boundary, and (3) along the short common boundary near the fork in the driveway, at a location where there is no fence.   Tall trees grow naturally at many locations on the properties, and there are many clumps of trees along the shoreline on the front lot that have been there for years, including many in the area of the second

and third locations described above.

The trees planted at the first location described above, near the fence where it meets the shore front, may obstruct the Gavins' view of the lake from the windows in the Gavins' renovated cottage if they grow above the height of the fence. Mr. Blouin testified that he had no objection to keeping their height below four feet. As long as they are under the height of the adjacent fence, they do not add to the degree of obstruction, and they serve a useful privacy purpose: the Gavins' boat dock is on the shoreline immediately next to the boundary fence, so vegetation in that location serves to screen the Gavins' activity on their dock from view from the Blouins' property, and vice versa. In addition, the existence of the trees may muffle sound between the properties.

The trees planted at the second location are near existing taller trees that have been there for a long time. The impact of the new trees at the second location, even when they grow tall, will have little effect on the Gavins' property, as nearby fully grown trees already impact the Gavins' view at that location. The trees planted at the third location are planted in a manner similar to a fence. They do and will, if they grow, hide the Gavins' utility area (boat trailer, wheelbarrow, utility shed) near the fork in the driveway, and serve to create a barrier for privacy near the fork in the access road. They have no impact on any view of the lake.

The wooden fence along the long common boundary impacts on each of the properties it separates in a different manner. The effect on the Blouins' side is to create privacy without interfering with camp use of the property. The orientation of the camp and all activity is toward the lake. The fence is therefore behind users of the property, and serves as a backdrop that effectively separates the Blouins' camp property from what is behind it. Although one can see some activity on the Gavin lot obliquely through the slats as one walks on the Blouin lot, the fence effectively screens off communication with the adjacent Gavin property to the rear, and significantly improves privacy on the Blouin lot. The height of the fence is not offensive, because one's attention is naturally directed toward the lake and away from the fence at all points on the lot. The fence successfully achieves the Blouins' goal of creating privacy vis a vis the neighboring Gavin lot. A fence six feet high would achieve the same effect. Roger Blouin's testimony that the additional two feet is necessary is not credible when the fence is viewed on site. A six foot fence would offer the same degree of privacy.

The effect on the Gavins' side is severe: the fence boxes the Gavins' small lot in to an extreme degree. The Gavins' lot is small and rectangular. The short sides are the lakefront to the east and the driveway to the west. The long side to the back (north) abuts wooded property. The long side to the front (south) is the common boundary with the Blouins, and is the side toward the point on which the Blouins' camp is located. The entire front long side, directly in front of the Gavin camp and front lawn, is now an 8 foot high wall which, when viewed directly

from first-floor windows in the Gavin cottage, appears solid. Furthermore, the fence does not taper down as it approaches the shoreline. Thus, the Gavins' view of their own lakefront from their own cottage includes an 8 foot wall that cuts across and into their line of vision toward the lake. For the Gavin lot, the fence does more than create privacy; it creates a feeling of isolation and containment, akin to what one might feel in a prison or castle yard. The impact extends into the lakefront view the Gavins have on their short east side.

## Conclusions of Law

The Plaintiffs characterize the trees and fence as "spite fences" in the nature of private nuisances erected in violation of 24 V.S.A. § 3817, and seek to enjoin Defendants from maintaining them. Defendants argue that the fences are justified based on their interest in privacy. They further argue that the Plaintiffs should have to meet a "clear and convincing" burden of proof, and should have to prove that spite, rather than privacy, is the dominant purpose of the fence. They claim that the Plaintiffs cannot meet this burden.

Vermont has no substantial case law discussing spite fences, although it has a statute relating to fences. It is helpful to review the development of the law of spite fences as a framework for analyzing this case under Vermont law.

Under the old English common law, no structure existing on an owner's property could be actionable as a "spite fence" because the property owner possessed an absolute right to construct anything on the owned property. See Sundowner, Inc. v. King, 509 P.2d 785, 786 (Idaho 1973). This aspect of the Old English common law came under fire quickly after its import to the United States, giving rise to the legal concept of the "spite fence." See generally Hornsby v. Smith, 13 S.E. 20 (Ga. 1941) (discussing early "spite fence" cases in the context of Old English common law). The earliest American cases frame the issue largely in terms of whether a property owner has an absolute right to use the property for the sole purpose of harassing an adjoining property owner. Early American courts responded in the negative and the result of those cases is some curtailment of the absoluteness of property rights. Modern courts vary concerning whether a "spite fence" cause of action arises out of property law or out of the tort of nuisance, but largely dismiss the distinction as without a difference. See, e.g., Haugen v. Kottas, 37 P.3d 672, 674 (Mont. 2001) (rejecting argument that remedy for "spite fence" must sound in nuisance rather than property law).

The great majority of jurisdictions now subscribe to the modern view that a spite fence may give rise to appropriate equitable relief. See Sundowner, 509 P.2d at 786. Many states accomplish this by statute. See, e.g., Wernke v. Halas, 600 N.E.2d 117 (Ind.App. 1992) (discussing Indiana statute providing a cause of action for certain fences deemed nuisances). In

other states, the courts have adopted the modern view as a development of the common law. See, e.g., Haugen, 37 P.3d at 674 (adopting the modern view); Sundowner, Inc., 509 P.2d at 787 (same). Through either means, it is a recognized cause of action giving rise to equitable relief.

States which have statutes regarding spite fences typically use broad language in defining "spite fence." As a result, the case law under those statutes does not differ dramatically from the case law of states without such statutes. One common, discernible difference is that spite fence statutes often specify a height as a factor in the analysis. See, e.g., Wernke, 600 N.E.2d at 121 (discussing Indiana's spite fence statute: "[a]ny fence or other structure in the nature of a fence unnecessarily exceeding six feet . . . in height, maliciously erected or maintained for the purpose of annoying the owners or occupants of adjoining property, shall be deemed a nuisance"). However, while some states with specified height in a statute interpret the height qualification as meaning no fence beneath the limitation can be considered a spite fence, see, e.g., id. at 121, others conclude that shorter fences may yet be spite fences under the circumstances, see, e.g., Griffin v. Northridge, 153 P.2d 800, 803 (Cal.App. 1944). In any event, the analysis is largely factual.

Several courts have addressed the issue of the "privacy defense." An issue inherent in the defense is that any defendant can argue privacy as the legitimate purpose for constructing a fence and thereby mute aggrieved plaintiffs. To avoid this result, some courts have dealt with this issue by reasoning that once the fence is determined to be a spite fence, then a claim to privacy is insufficient as a defense. Other courts disregard the privacy claim entirely, while yet others hold that privacy is insufficient by itself. For more on the privacy defense, see DeCecco v. Beach, 381 A.2d 543, 545 (Conn. 1977); Dowdell v. Bloomquist, 2002 WL 1803933 *3-4 (R.I. Super.). Several cases hold that no relief is available unless annoyance is the sole purpose in erecting the fence, with the result that any legitimate purpose for the fence obviates equitable relief. Modern cases that discuss the issue appear to agree that annoyance need only be the "dominant" purpose to support a claim to equitable relief, even if a legitimate claim to privacy also exists. Compare DeCecco, 381 A.2d at 545 (holding that malice must be primary – not sole – motive) with Rideout v. Knox, 19 N.E. 390, 392 (Mass. 1889) (holding that malevolence must be dominant motive, not merely one motive among many).

Turning to the law in Vermont, we find that Vermont enacted a statute in 1886 on the subject of annoyance fences. See 24 V.S.A. § 3817 (unnecessary fence; maintenance prohibited; penalty). It provides that:

> A person shall not erect or maintain an unnecessary fence or other structure for the purpose of annoying the owners of adjoining property by obstructing their view or depriving them of light or air. A person who violates a provision of this section shall be fined not more than $100.00.

This section is located in Chapter 109 (fences and fence viewers) of Title 24 (municipal and county government).  The statute does not specify injunctive relief for the aggrieved party, but no party is claiming that equitable court relief is not available under any circumstances.  The parties dispute the standard to be applied, and the burden of proof.

Legislative intent on the legal standard is clear enough from the statute: an abutter may not erect a fence to annoy neighbors by obstructing their view to the extent such a fence is "unnecessary."  This recognizes that a fence is allowed to the extent it is necessary to serve a legitimate function.  Restraint of animals and protection of crops are functions of fences clearly recognized in Chapter 109 of Title 24 and reflect economic interests of the late 1800's.  The terms of the statute do not restrict its application to those functions, and creating privacy between adjoining properties on small lots is certainly also a legitimate function that may be worthy of protection.  See, generally, Welsh v. Todd, 133 S.E.2d 171 (N.C. 1963) (holding that whether there was a legitimate reason for constructing a fence was a question for the jury to determine and therefore a judgment of nonsuit for the defendant was reversed).

Recognizing privacy as a legitimate purpose for a fence, the Vermont statute calls for Plaintiffs as alleged aggrieved parties to prove three elements:  that Defendants' fence is unnecessary in relation to the legitimate purpose of privacy, that it obstructs their view or deprives them of light and air, and that it was erected or maintained for the purpose of annoying the Plaintiffs.

Defendants claim that Plaintiffs are subject to a "clear and convincing" rather than a "preponderance" burden of proof.  Defendants' sole authority for the increased burden is 1 Am. Jur. 2d Adjoining Landowners § 113, which in turn cites solely to Hornsby v. Smith, 13 S.E.2d 20 (Ga. 1941).  The Hornsby court adopted the modern view on spite fences regardless of the inaction of the Georgia legislature.  The case provides an excellent review of the history of the doctrine and an extensive analysis of the wisdom of its adoption by the court, but it provides no analysis whatsoever with regard to its imposition of the clear and convincing burden of proof.  The adoption of the higher standard is not supported by sound reasoning.

The burden of proof in civil cases is by a "preponderance of the evidence."  Any higher burden should be established by statute, required by constitutional principles, or compelled by sound reasons of policy.  Defendants have not based their argument in favor of imposing a higher burden on any Vermont statute or constitutional argument, or well reasoned case analysis from other jurisdictions, or any substantive argument demonstrating policy interests sufficient to require a higher standard.  The higher standard adopted in Hornsby is an aberration rather than a majority position, and the court declines to adopt it.

Plaintiffs have met their burden of proof on each of the elements necessary to obtain equitable relief as to the wooden fence to the extent it exceeds six feet. The first element is that the fence is unnecessary in relation to the legitimate purpose of privacy. The facts show that the erection of a fence to provide visual obstruction between the parcels is legitimate for privacy purposes, but that a six foot fence is sufficient for that purpose, and that the additional two feet at the top are unnecessary for the purpose. Defendants' privacy is adequately ensured by the first six vertical feet of the fence. The portion of the fence above six feet simply has no legitimate privacy or other purpose with any evidentiary basis. The fence is an "unnecessary fence" to that extent.

The second element is that the fence obstructs the Plaintiffs' view and/or deprives them of light and air. The Plaintiffs have shown both by a preponderance of the evidence. The top two feet of the fence not only cut off the Plaintiffs' ability to look across the Blouins front parcel toward the lake, they unnecessarily cut into the Gavins' own view of the lake on their own lake frontage. Also, the additional two feet create the prison or castle wall impact on the Gavins' parcel, creating a boxed-in effect by blocking off light and air on the long open side.

The third element is that the purpose was to annoy the Plaintiffs. The primary proof on this point is the evidence that shows that the privacy justification for the additional two feet above six feet is not credible. The extra two feet contribute nothing useful to the privacy purpose of the fence, which is achieved by the first six feet, yet they have a harsh impact on the Gavin property. Further evidence supports a conclusion that the Blouins sought to annoy the Gavins: they resented Beverly Gavin's handling of the estate in a manner that neglected their interest, they resented the driveway conversations that the Gavins had with their friends who came to visit, and they are engaged in an intra family feud of several years duration. Thus, the court concludes that the Plaintiffs have proved their case for enjoining the maintenance of the wooden fence along the boundary line to the extent it exceeds six feet from the ground.

Plaintiffs have not shown by a preponderance of the evidence that the placement and existence of the trees on Defendants' property warrants equitable relief, except for those near the fence. The trees along the Blouins' new driveway blend with existing trees, fit the existing aesthetic of the property at that location, and fail to cognizably obstruct the view. The trees near the fork in the driveway serve a legitimate privacy function and do not obstruct the view. The court is wholly incapable of concluding that trees at these two locations constitute an unnecessary fence in any sense or were installed primarily to annoy Plaintiffs. The trees near the shoreline adjacent to the boundary fence will not obstruct the view as long as they are not allowed to grow higher than the adjacent fence, which they currently are not. Given Mr. Blouins' testimony that he is willing to keep them below four feet, an injunction as to trees at this location is unnecessary.

Defendants argue that any decision granting Plaintiffs an injunction is the equivalent of granting Plaintiffs an unbounded easement without requiring payment of consideration to Defendants. This is similar in nature to a claim that equitable relief arising from a spite fence is an unconstitutional "taking." Spite fence laws have withstood constitutional takings claims precisely because in a sound case no substantial, legitimate use of the property was in fact restricted by equitable relief. See, e.g., Rideout, 19 N.E. at 392 (concluding that "spite fence" statute is within the police power of the state precisely because height of fence above six feet was malicious and unnecessary). Plaintiffs have demonstrated that above six feet the fence unnecessarily restricts their view for the dominant purpose of annoyance without serving a necessary purpose on Defendants' property. This conclusion does not result in an "easement." Rather, it is consistent with the generally recognized common law principles of nuisance law, which are well established in Vermont. See Coty v. Ramsey Assoc., Inc., 149 Vt. 451 (1988).

## Order

Plaintiffs' attorney shall prepare a proposed order for review by Defendants' attorney in accordance with these Findings and Conclusions.

Dated at Montpelier, Vermont this ____ day of December, 2002.


_____
Mary Miles Teachout
Superior Court Judge